















RXC    6/25/02    14:43

3:02-CV-01238   VOTH V. PEREGRINE SYSTEMS

*1*

*CMP.*

1  Michael J. Aguirre, Esq., SBN 060402
   AGUIRRE & MEYER
2  A Professional Corporation
   550 West C Street, Suite 1350
3  San Diego, CA 92101
   (619) 235-8636
4
   Raymond P. Boucher, Esq. SBN 115364
5  Kiesel Boucher & Larson LLP
   8648 Wilshire Boulevard
6  Beverly Hills, CA 90211
   (310) 854-4444
7
   Robert P. Ottilie, Esq., SBN 095845          Thomas V. Urmy, Jr., Esq.
8  LAW OFFICES OF ROBERT OTTILIE                SHAPIRO HABER & URMY LLP
   550 West C Street, Suite 1600                75 State Street
9  San Diego, CA 92101                          Boston, MA 02109
   (619) 231-4841                               (617) 439-3939
10
   Attorneys for the Class
11

12

13                      UNITED STATES DISTRICT COURT

14            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15                      '02 CV 01 2 3 8 BTM (NLS)

16  MICHELE VOTH, VICTORIA JIBAJA   )   Case Number: _____
    MILLER, and MARIJO A. CLEMONS,  )
17  individually and on behalf of all present )
    and former EMPLOYEES OF         )
18  PEREGRINE SYSTEMS INC, who      )   CLASS ACTION COMPLAINT FOR
    participated in the Employee Stock )   FEDERAL SECURITIES VIOLATIONS.
19  Purchase Plan similarly situated, )
                                      )
20          Plaintiffs               )
                                      )   JURY TRIAL DEMANDED
21  v.                                )
                                      )
22  PEREGRINE SYSTEMS, INC.; JOHN J. )
    MOORES; STEPHEN P. GARDNER;      )
23  CHARLES E. NOELL III; MATTHEW C. )
    GLESS; JMI EQUITY FUND L.P.; JMI )
24  SERVICES INC.; ARTHUR ANDERSEN, )
                                      )
25          Defendants

26

27

28

**TABLE OF CONTENTS**

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

JMI VENTURE CAPITALIST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

PEREGRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FRAUDULENT FINANCIAL REPORTING
AND ACCOUNTING IRREGULARITIES . . . . . . . . . . . . . . . . . . . . . . . . . . 26

FALSE AND MISLEADING FINANCIAL REPORTS . . . . . . . . . . . . . . . . . . . . 31

FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

DEFENDANTS' VIOLATIONS OF GAAP . . . . . . . . . . . . . . . . . . . . . . . . . . 59

THE PEREGRINE "BARNEY" ALLIANCES . . . . . . . . . . . . . . . . . . . . . . . . . 61

PEREGRINE'S INFLATED SECOND QUARTER REVENUES . . . . . . . . . . . . . . 61

STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

FRAUD-ON-THE-MARKET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
       For Violations of Section 10(b) Of The Exchange Act
       And Rule 10b-5 Promulgated Thereunder Against All Defendants

SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
       For Violations of Section 20(a) Of The
       Exchange Act Against Defendants MOORES, GLESS,
       NOELL, GARDNER, JMI EQUITY and JMI SERVICES

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

i

**SUMMARY**

1.　This complaint is filed by the Plaintiffs on behalf of the employees of PEREGRINE SYSTEMS INC., ("PEREGRINE") who participated in the Employee Stock Purchase Plan from June 29, 1999 through May 6, 2002 and on behalf of those plaintiffs who were provided with incentive stock options who sustained damages as a result of the securities violations set forth herein.  PEREGRINE is a San Diego-based computer programming, data processing, and computer programing services company

2.　PEREGRINE and  four of PEREGRINE's principal executives or control persons, the venture capitalist that controlled PEREGRINE, and PEREGRINE's accountants, participated in a scheme to inflate the company's revenues, earnings and stock price for the period 1999 to 2002.  PEREGRINE is a San Diego-based computer programming, data processing, and computer programing services company.

3.　PEREGRINE and the other defendants engaged in fraudulent accounting practices such as secret side deals and software swaps that were fraudulent. PEREGRINE also booked sales deals with extended payment terms and improperly classified accounts receivable write-offs.  PEREGRINE also made numerous and significant manual adjustments to software license and maintenance revenue. PEREGRINE made secret "side agreements" with customers that allowed them to not pay for software they were agreeing to purchase and to otherwise manipulate the timing of payment on accounts so as to justify false and misleading financial reports. PEREGRINE's financial reports to investors did not disclose the extent to which such side deals existed.

4.　This is a class action seeking to pursue remedies under the Securities Exchange Act of 1934 (the Exchange Act") on behalf of all present and former PEREGRINE EMPLOYEES who purchased or otherwise acquired the securities of PEREGRINE between June 29, 1999 and May 6, 2002, inclusive (the "Class Period") and who were damaged thereby.

/ / /

1

**JURISDICTION AND VENUE**

5.     Plaintiffs bring this action pursuant to the Exchange Act as amended (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5.

6.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District. PEREGRINE is headquartered in this District.

7.     In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce.

**PARTIES**

8.     Plaintiff MICHELE VOTH (VOTH) is a resident of the Southern District of California who was employed by PEREGRINE SYSTEMS INC., at all times relevant herein from April 1985 through and including June 28, 2002.  Plaintiff VOTH participated in the Employee Stock Purchase Plan (ESPP) at all times since PEREGRINE went public in 1997. In reliance upon the information contained in the market about the value of PEREGRINE stock, Plaintiff elected to participate and continued to participate in the PEREGRINE ESPP from1997 through April 30, 2002.  VOTH made multiple purchases and sales of PEREGRINE and is presently the owner of 84 shares of PEREGRINE stock purchased on April 30, 2002 for $5.8225.  In addition, Plaintiff VOTH acquired the following vested stock options which have not yet been exercised as compensation for valuable services provided and as a result of the securities violations set forth herein, Plaintiff VOTH's options have become worthless:

| Date Option Granted | Number of Shares | Option Price |
| --- | --- | --- |
| October 28, 1999 | 675 | $19.16 |
| October 4, 2000 | 1000 | $16.57 |

2

| Date Option Granted | Number of Shares | Option Price |
|---|---|---|
| April 5, 2001 | 222 | $13.75 |
| October 2, 2001 | 1000 | $11.65 |

9.    Plaintiff VICTORIA JIBAJA MILLER (MILLER) is a resident of San Diego County and this District who was employed by PEREGRINE SYSTEMS INC., at all times relevant herein from March 1, 1999 through June 28, 2002.  Plaintiff MILLER participated in the Employee Stock Purchase Plan (ESPP) at all times since July 2000.   In reliance upon the information contained in the market about the value of PEREGRINE stock, Plaintiff MILLER elected to participate and continued to participate in the PEREGRINE ESPP from July 2000 through October 2001.   Plaintiff MILLER made multiple purchases and sales of PEREGRINE as follows:

| Transaction Date | Sale or Purchase | Number of Stock | Price per Share |
|---|---|---|---|
| July 3, 2000 | Purchase | 39 | $20.4531 |
| July 31, 2000 | Purchase | 39 | $20.4531 |
| October 31, 2000 | Purchase | 41 | $20.4000 |
| April 30, 2001 | Purchase | 88 | $21.0375 |
| October 21, 2001 | Purchase | 125 | $12.2740 |

Plaintiff MILLER presently owns 332 shares of PEREGRINE stock. In addition, Plaintiff MILLER acquired the following vested stock options which have not yet been exercised as compensation for valuable services provided and as a result of the securities violations set forth herein, Plaintiff MILLER's options have become worthless:

| Date Option Granted | Number of Shares | Option Price |
|---|---|---|
| April 5, 2001 | 222 | $13.75 |
| October 2, 2001 | 500 | $11.65 |
| May 5, 1999 | 600 | $8.75 |
| May 24, 2000 | 201 | $17.25 |

3

| Date Option Granted | Number of Shares | Option Price |
|---|---|---|
| October 4, 2000 | 1000 | $16.57 |

10.     Plaintiff MARIJO A. CLEMONS (CLEMONS) is a resident of San Diego County who was employed by PEREGRINE SYSTEMS INC. at all times relevant herein from September 1998 through June 28, 2002. Plaintiff CLEMONS participated in the Employee Stock Purchase Plan (ESPP) at all times since April 7, 2000.  In reliance upon the information contained in the market about the value of PEREGRINE stock, Plaintiff elected to participate and continued to participate in the PEREGRINE ESPP from 2000 through May 6, 2002.  Plaintiff CLEMONS made multiple purchases and sales of PEREGRINE as follows:

| Transaction Date | Sale or Purchase | Number of Stock | Price per Share |
|---|---|---|---|
| 07-31-00 | Purchase | 30 | 20.4531 |
| 10-31-00 | Purchase | 22 | 20.40 |
| 04-30-01 | Purchase | 39 | 21.375 |
| 10-31-01 | Purchase | 105 | 12.274 |
| 10-11-01 | Purchase | 6 | 16.30 |
| 01-03-02 | Purchase | 5 | 8.98 |
| 01-03-02 | Purchase | 5 | 9.00 |
| 05-03-02 | Purchase | 50 | 2.63 |
| 05-06-02 | Purchase | 100 | 1.01 |
| 01-21-99 | Purchase | 20 | 59-5/8 |
| 04-07-00 | Purchase | 23 | 36-9/16 |
| 05-06-02 | Purchase | 500 | 1.005 |
| 06-06-02 | Sale | 603 | 1.19 |

Plaintiff CLEMONS presently owns 302 shares of PEREGRINE stock. In addition, Plaintiff CLEMONS acquired the following vested stock options which have not yet been exercised as compensation for valuable services provided and as a result of the securities violations set forth herein, Plaintiff CLEMONS's options have become

4

worthless:

| Date Option Granted | Number of Shares | Option Price |
|---|---|---|
| 06-28-02 | 600 | 8.57 |
| 06-28-02 | 500 | 16.57 |
| 06-28-02 | 600 | 19.16 |
| 06-28-02 | 201 | 17.25 |
| 04-05-01 | 222 | 13.75 |

11.     Defendant PEREGRINE was incorporated under the laws of the State of California and reincorporated under the laws of the State of Delaware.  PEREGRINE is a Delaware corporation which maintains its principal executive offices at 3611 Valley Centre Drive, San Diego, California.   PEREGRINE purports to offer software products, services and technologies that permit businesses to eliminate points of frictions in their business processes and to improve their return on capital and investment in their infrastructure assets and electronic business investments.

12.     Defendant John Jay MOORES ("MOORES") controlled PEREGRINE during all relevant times alleged in this operative complaint through direct and indirect stock ownership and otherwise.  Defendant Moores acquired control of PEREGRINE beginning in 1989 before it was a public company.  Defendant Moores and his related entities acquired PEREGRINE shares of Common Stock from 1989 through 1995 at prices ranging from $1.33 to $2.34 in transactions directly with PEREGRINE and in third-party transactions with former stockholders of the company.  By April 1997, when PEREGRINE went public, defendant Moores and entities affiliated with Mr. Moores collectively owned approximately 62.5% of PEREGRINE's outstanding shares.  Until at least April 1997 defendant Moores guaranteed PEREGRINE's outstanding indebtedness under a credit line and term loan with Nations' Bank of Texas, N.A. ("Nations' Bank").

13.     Defendant MOORES owned PEREGRINE stock individually and as trustee of various trusts, substantially all of which were established for members of defendant MOORES' family.  Defendant MOORES also acquired and held stock in PEREGRINE

1   through one of his venture capital companies, defendant JMI EQUITY FUND, L.P.

2        14.    Defendant MOORES has served as a member of PEREGRINE's board of

3   directors since March 1989 and as chairman of PEREGRINE's board of directors from

4   March 1990 until July 2000 and 6 May 2002 to present.

5        15.    Defendant JMI EQUITY FUND L.P. is one of defendant MOORES venture

6   capital companies operated under the JMI banner. Defendant JMI SERVICES INC.,

7   serves as the general partner of JMI EQUITY FUND L.P.  PEREGRINE was under the

8   common control of JMI EQUITY FUND L.P., and JMI SERVICES INC., during substantial

9   periods of the time PEREGRINE was engaged in violations of Section 10(b) and Rule

10  10(b)5. PEREGRINE was also under the common control of defendants MOORES and

11  NOELL III, who controlled JMI EQUITY FUND and JMI SERVICES INC.

12       16.    Defendant MOORES and entities and persons affiliated with defendant

13  MOORES owned approximately 62.5% of PEREGRINE stock as of April 1997.

14  Defendant MOORES and his affiliated entities and persons sold over $611 million of

15  PEREGRINE stock at prices he knew were materially inflated by PEREGRINE's false

16  financial statements as follows:

17

18

| Sale No. | Date | Number of Shares | Sale Price | Sale Proceeds |
|---|---|---|---|---|
| 1 | 10/29/1997 | 262,296 | $15.25 | $4,000,014 |
| 2 | 2/25/1998 | 25,000 | $17.25 | $431,250 |
| 3 | 2/26/1998 | 52,260 | $17.00 | $888,420 |
| 4 | 2/26/1998 | 47,450 | $17.00 | $806,650 |
| 5 | 2/27/1998 | 123,616 | $17.00 | $2,101,472 |
| 6 | 2/27/1998 | 75,918 | $17.00 | $1,290,606 |
| 7 | 7/23/1998 | 185,424 | $37.32 | $6,920,024 |
| 8 | 7/23/1998 | 185,424 | $37.32 | $6,920,024 |
| 9 | 7/23/1998 | 114,576 | $37.32 | $4,275,976 |
| 10 | 7/23/1998 | 114,576 | $37.32 | $4,275,976 |
| 11 | 7/24/1998 | 185,424 | $35.26 | $6,538,050 |
| 12 | 7/24/1998 | 185,424 | $36.26 | $6,723,474 |
| 13 | 7/24/1998 | 114,576 | $36.26 | $4,154,526 |
| 14 | 7/24/1998 | 114,576 | $35.26 | $4,039,950 |
| 15 | 7/27/1998 | 114,700 | $35.60 | $4,083,320 |

6

| | Sale No. | Date | Number of Shares | Sale Price | Sale Proceeds |
|---|---|---|---|---|---|
| | 16 | 7/27/1998 | 114,700 | $35.60 | $4,083,320 |
| | 17 | 7/27/1998 | 70,872 | $35.60 | $2,523,043 |
| | 18 | 7/27/1998 | 70,872 | $35.60 | $2,523,043 |
| | 19 | 7/28/1998 | 39,822 | $36.17 | $1,440,362 |
| | 20 | 7/28/1998 | 39,822 | $36.17 | $1,440,362 |
| | 21 | 7/28/1998 | 24,606 | $36.17 | $889,999 |
| | 22 | 7/28/1998 | 24,606 | $36.17 | $889,999 |
| | 23 | 8/10/1998 | 31,770 | $35.00 | $1,111,950 |
| | 24 | 8/10/1998 | 10,075 | $35.09 | $353,532 |
| | 25 | 8/10/1998 | 6,187 | $35.09 | $217,102 |
| | 26 | 8/12/1998 | 51,000 | $35.00 | $1,785,000 |
| | 27 | 8/12/1998 | 734 | $35.00 | $25,690 |
| | 28 | 8/25/1998 | 26,000 | $34.66 | $901,160 |
| | 29 | 10/23/1998 | 52,571 | $36.25 | $1,905,699 |
| | 30 | 10/23/1998 | 32,229 | $36.25 | $1,168,301 |
| | 31 | 10/27/1998 | 24,797 | $36.06 | $894,180 |
| | 32 | 10/27/1998 | 15,109 | $36.06 | $544,831 |
| | 33 | 10/30/1998 | 232,600 | $34.89 | $8,115,414 |
| | 34 | 10/30/1998 | 141,526 | $34.89 | $4,937,842 |
| | 35 | 11/5/1998 | 72,580 | $39.87 | $2,893,765 |
| | 36 | 11/5/1998 | 59,138 | $39.87 | $2,357,832 |
| | 37 | 11/6/1998 | 10,138 | $39.42 | $399,640 |
| | 38 | 11/6/1998 | 6,322 | $39.42 | $249,213 |
| | 39 | 11/9/1998 | 4,302 | $37.68 | $162,099 |
| | 40 | 11/9/1998 | 2,682 | $37.68 | $101,058 |
| | 41 | 11/17/1998 | 157,617 | $35.88 | $5,655,298 |
| | 42 | 11/17/1998 | 98,273 | $35.88 | $3,526,035 |
| | 43 | 11/18/1998 | 9,278 | $36.25 | $336,328 |
| | 44 | 11/18/1998 | 5,786 | $36.25 | $209,743 |
| | 45 | 11/19/1998 | 44,798 | $36.26 | $1,624,375 |
| | 46 | 11/19/1998 | 27,928 | $36.26 | $1,012,669 |
| | 47 | 2/22/1999 | 804,521 | $23.00 | $18,503,983 |
| | 48 | 2/22/1999 | 393,037 | $23.00 | $9,039,851 |
| | 49 | 5/20/1999 | 59,772 | $20.68 | $1,236,085 |
| | 50 | 5/20/1999 | 59,772 | $20.68 | $1,236,085 |
| | 51 | 5/20/1999 | 39,980 | $20.68 | $826,786 |
| | 52 | 5/21/1999 | 35,863 | $20.42 | $732,322 |
| | 53 | 5/21/1999 | 35,863 | $20.42 | $732,322 |
| | 54 | 5/21/1999 | 23,987 | $20.42 | $489,815 |
| | 55 | 5/21/1999 | 23,987 | $20.42 | $489,815 |
| | 56 | 5/24/1999 | 8,966 | $20.17 | $180,844 |
| | 57 | 5/24/1999 | 8,966 | $20.17 | $180,844 |
| | 58 | 5/24/1999 | 5,996 | $20.17 | $120,939 |
| | 59 | 5/24/1999 | 5,996 | $20.17 | $120,939 |
| | 60 | 5/25/1999 | 378,900 | $19.55 | $7,407,495 |

| Sale No. | Date | Number of Shares | Sale Price | Sale Proceeds |
|---|---|---|---|---|
| 61 | 5/25/1999 | 378,900 | $19.55 | $7,407,495 |
| 62 | 5/25/1999 | 236,159 | $19.55 | $4,616,908 |
| 63 | 5/25/1999 | 236,159 | $19.55 | $4,616,908 |
| 64 | 5/25/1999 | 16,395 | $19.55 | $320,522 |
| 65 | 5/25/1999 | 16,395 | $19.55 | $320,522 |
| 66 | 5/25/1999 | 974 | $19.55 | $19,042 |
| 67 | 5/25/1999 | 974 | $19.55 | $19,042 |
| 68 | 5/26/1999 | 10,000 | $20.25 | $202,500 |
| 69 | 5/27/1999 | 649,000 | $19.58 | $12,707,420 |
| 70 | 5/27/1999 | 411,400 | $19.58 | $8,055,212 |
| 71 | 5/27/1999 | 411,400 | $19.58 | $8,055,212 |
| 72 | 5/27/1999 | 808 | $19.58 | $15,821 |
| 73 | 5/27/1999 | 808 | $19.58 | $15,821 |
| 74 | 5/28/1999 | 223,000 | $20.50 | $4,571,500 |
| 75 | 5/28/1999 | 138,144 | $20.50 | $2,831,952 |
| 76 | 5/28/1999 | 138,144 | $20.50 | $2,831,952 |
| 77 | 5/28/1999 | 4,038 | $20.50 | $82,779 |
| 78 | 5/28/1999 | 4,038 | $20.50 | $82,779 |
| 79 | 5/28/1999 | 889 | $20.50 | $18,225 |
| 80 | 7/26/1999 | 1,522,719 | $28.50 | $43,397,492 |
| 81 | 7/26/1999 | 970,923 | $28.50 | $27,671,306 |
| 82 | 2/17/2000 | 1,143,016 | $46.06 | $52,647,317 |
| 83 | 2/17/2000 | 251,436 | $46.06 | $11,581,142 |
| 84 | 2/18/2000 | 2,122,736 | $43.68 | $92,721,108 |
| 85 | 2/18/2000 | 466,960 | $43.68 | $20,396,813 |
| 86 | 2/28/2000 | 408,220 | $51.35 | $20,962,097 |
| 87 | 2/28/2000 | 89,799 | $51.35 | $4,611,179 |
| 88 | 2/29/2000 | 408,220 | $52.65 | $21,492,783 |
| 89 | 2/29/2000 | 89,799 | $52.65 | $4,727,917 |
| 90 | 2/8/2001 | 77,000 | $30.19 | $2,324,630 |
| 91 | 2/12/2001 | 175,000 | $28.00 | $4,900,000 |
| 92 | 2/13/2001 | 385,000 | $28.54 | $10,987,900 |
| 93 | 2/15/2001 | 1,104,022 | $29.67 | $32,756,333 |
| 94 | 2/16/2001 | 280,000 | $29.76 | $8,332,800 |
| 95 | 2/16/2001 | 218,978 | $28.91 | $6,330,654 |
| 96 | 2/20/2001 | 210,000 | $30.04 | $6,308,400 |
| 97 | 2/23/2001 | 506,223 | $30.52 | $15,449,926 |
| 98 | 2/26/2001 | 360,000 | $28.97 | $10,429,200 |
| 99 | 2/27/2001 | 50,000 | $26.70 | $1,335,000 |
| 100 | 2/28/2001 | 90,000 | $25.29 | $2,276,100 |

**$611,458,449**

17.     When evidence of the fraudulent scheme was uncovered in May 2002 defendant MOORES asserted his control of PEREGRINE and resumed his formal position as Chairman of the Board of Directors on 6 May 2002.

18.     Defendant MOORES is a resident of the Southern District of California and engaged in the wrongful acts alleged within the boundaries of the Southern District of California.  Defendant MOORES has controlled defendant PEREGRINE at all times relevant to the facts alleged in this operative complaint.  Defendant MOORES gained and exercised his control by stock ownership, directly and indirectly through defendants JMI EQUITY FUND L.P., JMI SERVICES INC., and defendant CHARLES E. NOELL III.

19.     Defendant MOORES' venture capital company, defendant JMI SERVICES INC., and the JMI Equity Funds and staff maintain their offices at the same location as PEREGRINE's offices.  PEREGRINE leased to defendant JMI SERVICES INC., and its related entities, 13,100 square feet of office space at PEREGRINE's home office in San Diego.

20.     Defendant Charles E. NOELL III ("NOELL") serves as President and Chief Executive Officer of defendant MOORES venture capital company, JMI SERVICES INC., the general partner of the JMI EQUITY FUND L.P.s.  Defendant NOELL served as a member of PEREGRINE's board of directors since January 1992.  Defendant NOELL sold over $15 million of PEREGRINE stock at prices he knew were materially inflated by PEREGRINE's false financial statements.  Defendant NOELL was at material times the conduit through which defendant MOORES exercised his control over PEREGRINE.  In addition to PEREGRINE, NOELL serves on the board of directors for the following entities in which JMI Equity Funds, holds or has held within its portfolio: Authentify, Inc.; BEZ Systems, Inc.; Mindflow Technologies, Inc.; NEON Systems, Inc.; Scalable Software, Inc.; Skunkware, Inc. At all times relevant herein, NOELL was a control person of PEREGRINE.

21.     Defendant Stephen P. GARDNER ("GARDNER") became PEREGRINE's chairman of board of directors in July 2000 and served as PEREGRINE's chief executive

9

officer since 1998. Defendant GARDNER served as PEREGRINE's president and as a director from April 1998 to July 2000. From January 1998 until April 1998, defendant GARDNER served as PEREGRINE's executive vice president and principal executive officer. From May 1997 until January 1998, defendant GARDNER served as PEREGRINE's vice president of strategic acquisitions. Defendant GARDNER is a resident of the Southern District of California and engaged in the alleged wrongdoing within the Southern District of California. Defendant GARDNER sold almost 500,000 shares of PEREGRINE stock at prices he knew were materially inflated by PEREGRINE's false financial statements. On 6 May 2002 as a result of the fall out from the unlawful activities alleged in this operative complaint defendant GARDNER resigned his PEREGRINE positions. At all times relevant herein, GARDNER was a control person of PEREGRINE.

22. Defendant Matthew C. GLESS ("GLESS") was at all relevant times Executive Vice President, Chief Financial Officer and a director of PEREGRINE. GLESS joined the Company as corporate controller in April 1996. From October 1996 through October 1998, he served as Vice President, Finance and Chief Accounting Officer. GLESS has served as Chief Financial Officer and a member of the Board of Directors of the Company since October 2000. GLESS signed the reports on Form 10-Q for the first fiscal quarter ended June 30, 2001 ("First Quarter 10-Q"), second fiscal quarter ended September 30, 2001 ("Second Quarter 10-Q"), and third fiscal quarter ended December 31, 2001 ("Third Quarter 10-Q"), filed by PEREGRINE with the SEC, which contained material overstatements of PEREGRINE's revenues and earnings. GLESS is a resident of the Southern District of California and engaged in the wrongful actions alleged herein within the boundaries of the Southern District of California. At all times relevant herein GLESS was a control person of PEREGRINE.

23. Defendant JMI EQUITY FUND L.P (hereinafter "JMI EQUITY") was established in 1992 by defendant MOORES as his personal investment fund. Defendant JMI EQUITY FUND L.P. was one of the entities controlling defendant PEREGRINE, while

1  defendant PEREGRINE was engaged in the violations of Section 10-B and Rule 10-B 5

2  alleged in this operative complaint.

3        24.     Defendant JMI SERVICES  L.P. (hereinafter JMI SERVICES)  is the sole

4  general partner of JMI EQUITY.   Defendant JMI SERVICES was one of the entities

5  controlling defendant PEREGRINE, while defendant PEREGRINE was engaged in the

6  violations of Section 10-B and Rule 10-B 5 alleged in this operative complaint.

7  Defendant MOORES and NOELL controlled defendant JMI EQUITY and JMI SERVICES

8  through ownership and by management control.

9        25.     Defendants MOORES, GLESS, GARDNER, NOELL, JMI EQUITY and JIM

10  SERVICES are sometimes collectively herein referred to as the INDIVIDUAL

11  DEFENDANTS.  The INDIVIDUAL DEFENDANTS, because of their positions with

12  PEREGRINE, controlled the contents of quarterly and annual reports, press releases and

13  presentations to securities analysts.  Each Individual Defendant was provided with copies

14  of the reports and press releases alleged herein to be misleading prior to or shortly after

15  their issuance and had the ability and opportunity to prevent their issuance or cause them

16  to be corrected.  Because of their positions and access to material non-public information

17  available to them but not the public, each of these Defendants knew that the adverse

18  facts specified herein had not been disclosed to and were being concealed from the

19  public and that the positive representations which were being made were then false and

20  misleading.  As a result, each of the INDIVIDUAL DEFENDANTS is responsible for the

21  accuracy of PEREGRINE's corporate releases detailed herein as "group-published"

22  information and is therefore liable for the representations contained herein.

23        26.     Defendant ARTHUR ANDERSEN, LLP (hereafter "ARTHUR ANDERSEN")

24  is an international accounting and consulting firm engaged in the business of providing

25  audits and other accounting services in the Southern District of California.   ARTHUR

26  ANDERSEN was engaged at all times relevant herein to provide "independent" auditing

27  and accounting services, including audits and reviews of PEREGRINE's financial

28  statements included in filings with the SEC, including audited and unaudited financial

11

1   statements and annual reports.  At all times relevant herein ARTHUR ANDERSEN had

2   access to knowledge of PEREGRINE's private and confidential corporate information and

3   business information.  ARTHUR ANDERSEN certified financial statements which they

4   knew contained material misstatements of material financial facts and failed to disclose

5   material facts.  Defendant ARTHUR ANDERSEN issued false and fraudulent

6   certifications for at least three of PEREGRINE's financial statements included in

7   PEREGRINE's 1999, 2000, and 2001 annual reports on Form 10-K's which were

8   disseminated to the public and were responsible for artificially inflating the value of

9   PEREGRINE stock.  ARTHUR ANDERSEN also provided essential accounting services

10  in preparing PEREGRINE's nine 10-Q's for the periods in 30 June 1999 to 31 December

11  2001, and amendments thereto.  Defendant ARTHUR ANDERSEN also prepared the

12  financial statements contained in PEREGRINE'S public offerings filed on various Forms

13  with the Securities and Exchange Commission.

14                            **CLASS ACTION ALLEGATIONS**

15          27.      Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3)

16  of the Federal Rules of Civil Procedure on behalf of the employees and former

17  Employees of PEREGRINE  who purchased PEREGRINE securities through the

18  PEREGRINE Employee Stock Purchase Plan ("ESPP) during the Class Period of June

19  29, 1999 through and including May 6, 2002 and for all such employees who received

20  PEREGRINE stock options for valuable services rendered which have become worthless

21  as a result of the securities violations alleged herein.  Excluded from the Class are

22  Defendants herein, members of each Individual Defendant's immediate family, any entity

23  in which any Defendant has a controlling interest, and the legal affiliates, representatives,

24  heirs, controlling persons, successors, and predecessors in interest or assigns of any

25  such excluded party.

26          28.      Because PEREGRINE has thousands of current and former employees

27  who participated in the ESPP by dedicating a portion of their salary each pay period

28  toward the acquisition of stock, members of the Class are so numerous that joinder of all

                                              12

1   members is impracticable.  As of December 21, 2001, PEREGRINE had over 192 million

2   shares outstanding.  While the exact number of Class members can only be determined

3   by appropriate discovery, Plaintiff believes that Class members number at least in the

4   thousands and that they are geographically dispersed in such areas as San Diego,

5   California, Atlanta, Georgia, Dallas, Texas, Concord, California and elsewhere.

6        29.    Plaintiff's claims are typical of the claims of the members of the Class,

7   because Plaintiff and all of the Class members sustained damages arising out of

8   Defendants' wrongful conduct complained of herein.

9        30.    Plaintiff will fairly and adequately protect the interests of the Class members

10  and has retained counsel who are experienced and competent in class and securities

11  litigation.  Plaintiff has no interests that are contrary to or in conflict with the members of

12  the Class Plaintiff seeks to represent.

13       31.    A class action is superior to all other available methods for the fair and

14  efficient adjudication of this controversy, because joinder of all members is impracticable.

15  Furthermore, the damages suffered by individual members of the Class may be relatively

16  small, and the expense and burden of individual litigation make it impossible for the

17  members of the Class individually to redress the wrongs done to them.  There will be no

18  difficulty in the management of this action as a class action.

19       32.    Questions of law and fact common to the members of the Class

20  predominate over any questions that may affect only individual members, in that

21  Defendants have acted on grounds generally applicable to the entire Class.  Among the

22  questions of law and fact common to the Class are:

23       a.     whether Defendants violated the federal securities laws as alleged herein;

24       b.     whether PEREGRINE's publicly disseminated releases and statements

25              during  the Class Period omitted and/or misrepresented material facts and

26              whether Defendants breached any duty to convey material facts or to

27              correct material facts previously disseminated;

28  ///

c.   whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

d.   whether Defendants acted willfully or recklessly in omitting and/or misrepresenting material facts;

e.   whether the market prices of PEREGRINE securities during the class period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

f.   whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## FACTUAL ALLEGATIONS

**JMI VENTURE CAPITALIST**

33.   Defendants MOORES and NOELL caused a series of JMI EQUITY limited partnerships to be formed including JMI Equity Fund I-IV. Defendant MOORES used the proceeds from his sale of BMC Software, a company he founded in 1981, to capitalize JMI EQUITY and other JMI ENTITIES.

34.   Defendant MOORES hired defendant NOELL to manage JMI EQUITY. Defendants MOORES and NOELL became associated at BMC Software in connection with BMC Software's initial public offering in 1988. Defendant MOORES was the founder of BMC Software and controlled it when it went public in 1988. Defendant NOELL was employed by Alex Brown & Sons which was an underwriter of BMC Software's initial public offering. Defendant NOELL worked with MOORES on BMC Software's initial public offering.

35.   Defendants MOORES and NOELL focused defendant JMI EQUITY on making investments in technology-oriented growth companies and partnering with emerging growth companies in the software and information services sector. Defendants JMI EQUITY, and MOORES investment in PEREGRINE was part of a pattern of investments these defendants made in private software companies before they went public.

14

36.     From their joint experience in taking BMC Software public, from which MOORES derived income in the after market of over $400 million, defendants MOORES and NOELL learned the factors that drove prices of software company stock.  In particular, defendants MOORES and NOELL knew that promising financial statements showing continued earnings growth could drive stock prices upward.  Both defendants also knew how insiders could dispose of millions of shares of stock at artificially inflated prices.

37.     Defendants MOORES and NOELL organized JMI EQUITY, and its related JMI ENTITIES to act as a venture capitalist focused on acquiring positions in early-stage software companies.  Defendants MOORES and NOELL organized JMI EQUITY to be a venture capital firm focused on enterprise application and infrastructure software and services.  Defendants MOORES and NOELL provided JMI EQUITY with knowledge of how to generate successful looking financial statements.  Defendant MOORES and NOELL were venture capitalists and organized JMI EQUITY to act as a venture capitalist in providing financing to software companies as set forth above.

38.     Between 1992 and 2000 defendants MOORES and NOELL caused JMI EQUITY to invest in and sponsor over 40 early-stage software and information services companies.  Defendants MOORES and NOELL focus was to transform or expand their sponsored companies into "growth" companies.  Once invested, defendants MOORES and NOELL, through JMI EQUITY., worked closely with management in JMI L.P.'s portfolio companies to produce stronger appearing financial statements.  A JMI EQUITY representative sits on the board of each of JMI EQUITY's portfolio companies.

39.     With the intent of impressing the investing public, defendants MOORES and NOELL worked with JMI EQUITY portfolio companies to create the appearance that JMI EQUITY's investment in the targeted company proved the target company was a sound investment.

40.     Defendants MOORES and NOELL worked with at least 12 of their portfolio companies through JMI EQUITY to take them public.  Defendants MOORES and NOELL,

15

1   through JMI EQUITY and related JMI ENTITIES followed this common format in taking at

2   least the following 12 companies, in addition to PEREGRINE, public:

3   **(1) Transaction Sys. Architects:**          [NASDAQ:TASI] Provided software and services

4                                                 for retail and wholesale funds in the electronic

5                                                 funds transfer market.  Initial Public Offering

6                                                 February 1995.

7   **(2) Expert Software:**                      [NASDAQ: XPRT] Initial Public Offering of 3.1

8                                                 million shares April 1995.  JMI EQUITY sold

9                                                 between 11 April 1995 to 13 April 1995 173,713

10                                                shares.  Expert's products addressed a range of

11                                                consumer interest and everyday tasks for the

12                                                productivity, lifestyle, small office/home office,

13                                                entertainment and education market categories.

14  **(3) Meta Group Inc:**                       [NASDAQ: METG] Initial Public Offering of 1.86

15                                                million shares, December 1995.  JMI Equity

16                                                Fund sold 223,000 shares between August and

17                                                November 1996.  Meta provided research and

18                                                analysis of developments and trends in the

19                                                computer hardware, software, communications,

20                                                and related information technology industries.

21  **(4) Prism Solutions:**                      [NASDAQ: PRZM] Initial Public Offering of

22                                                2.3525 million shares, March 1996.  JMI

23                                                invested about $1 million for its 5.7%.  JMI's

24                                                shares, numbering a little over 800,000 were

25                                                valued, as of 8 April 1996 at $20 million.  Prism

26                                                designed, developed marketed and supported

27                                                data warehouse management software.

28  **(5) Optika Imaging Systems:**               [NASDAQ:OPTK] Initial Public Offering of 2

| | |
|---|---|
| 1 | million shares, July 1996.  JMI Harry Gruner |
| 2 | served on Optika's board.  Optika provided high- |
| 3 | performance, client/server, integrated imaging |
| 4 | software designed to meet the needs of paper- |
| 5 | intensive industries. |
| 6 | **(6) PEREGRINE Systems(XVT)**: [NASDAQ: PRGN] Initial Public Offering of April |
| 7 | 1997 2.3 million shares.  John MOORES made |
| 8 | Chairman of the Board of Directors.  MOORES |
| 9 | acquired 63% of the stock directly and 8.4% |
| 10 | through JMI EQUITY, indirectly. MOORES sold |
| 11 | over 41 million shares of PEREGRINE for about |
| 12 | $500 million.  PEREGRINE provided Employee |
| 13 | Self Service, Infrastructure Management, and e- |
| 14 | Business connectivity solutions.  PEREGRINE |
| 15 | acquired XVT for $4.7 million but XVT's liabilities |
| 16 | exceeded its assets by $915,000.  MOORES |
| 17 | held voting control directly and indirectly through |
| 18 | JMI EQUITY  MOORES received PEREGRINE |
| 19 | stock worth about $3.7 million. |
| 20 | **(7) Jackson Hewitt** [NASDAQ:JTAX] Initial Public Offering formally |
| 21 | on 25 January 1994 to original 700 |
| 22 | shareholders.  First public offering was on 5 |
| 23 | August 1997.  JMI EQUITY, was part of a stock |
| 24 | reorganization on 18 June 1997 in which JMI |
| 25 | and others exchanged their preferred stock for |
| 26 | common stock involving 700 thousand shares. |
| 27 | Jackson Hewitt was a national tax preparation |
| 28 | service. |

| | |
|---|---|
| **(8) Neon Systems** | [NASDAQ:NESY] Neon developed middleware solutions that provided remote access to relationship and non-relational databases residing on mainframe and minicomputer and workstation platforms. |
| **(9) Mission Critical Software:** | [NASDAQ: MCSW] Developed Windows NT-based products that improved security administration and reduced total cost of ownership for companies deploying NT systems. |
| **(10) eBenX:** | [NASDAQ:EBNX] Provided business-to-business solutions. |
| **(11) Bindview Dev. Corp:** | [NASDAQ:BVEW] Designed, marketed, and sold network systems management software for Microsoft NT and Novell Netware networks. |
| **(12) V-One Corp:** | Developed and supported a set of network security products, encompassing authentication, encryption, smart cards, firewalls, and application layer security. |

41.   Defendant MOORES, through the JMI ENTITIES, while being managed by defendant NOELL, took investment positions in the following companies as part of the common pattern and practice of providing venture capital with the intention of eventually taking the companies public. These companies became part of JMI's venture capital portfolio:

| | |
|---|---|
| **Softworld Serv. Corp:** | JMI invested on 1 August 1995. Offered software manufacturing services to the software publishing market. |
| **Strategic Mapping:** | JMI invested on 1 August 1995. Developed, marketed and sold products for decision makers |

18

| | |
|---|---|
| **Haht Software:** | JMI invested on 16 January 1996.  Developed technology for building Web-based applications. |
| **Nat. Bankcard Ass:** | JMI invested on 16 July 1996.  Merchant payment processing company.  JMI EQUITY provided $5.0 million. Defendants MOORES and NOELL admitted to the Board of Directors. |
| **Angara Database Systems:** | JMI invested on 5 November 1997.  Developed ultra high-performance memory resident relational databases.  JMI provided a portion of $2.5 million first round private financing. |
| **Bindview Dev. Corp:** | JMI invested on 6 November 1997.  Developed and marketed network systems and asset management products.  JMI provided a portion of $18 million private placement. |
| **Corp Man Solutions:** | JMI invested on 26 March 1998.  Provided equity compensation, corporate management software solutions. JMI EQUITY III provided first round equity funding. |
| **PROS Strategic Solutions:** | JMI invested on 10 June 1998.  Provided airline revenue management systems.  JMI Equity Fund purchased minority position in PROS. |
| **PMG Management GP:** | JMI invested on 23 February 1999.  Provided profitability software and consulting services to financial institutions.  JMI Equity Fund III, L.P. provided venture capital to PMG. |
| **Courion Corp:** | JMI invested on 11 May 1999.  Provided IT Self-Service and Support Chain Automation solutions.  JMI Equity Fund III, L.P. provide the lead financing of a $.1 |

19

| | |
|---|---|
| 1 | million investment. |
| 2 | **Blackbaud**: |
| 3 | |
| 4 | |
| 5 | |
| 6 | **Fundamental Software**: |
| 7 | |
| 8 | |
| 9 | |
| 10 | **Authentify**: |

1 million investment.

2 **Blackbaud**: JMI invested on 19 October 1999. Provided software

3 for nonprofit community worldwide. JMI took a

4 controlling interest in Blackbaud. Paul Barber of JMI

5 added to the Board of Directors.

6 **Fundamental Software**: JMI invested on 14 February 2000. Vendor of

7 configurations management products for Windows

8 NT/2000-based networks and Websites. JMI lead a

9 round of $4.5 million venture capital.

10 **Authentify**: JMI invested on 1 May 2000. Provided software that

11 confirms the identity of Web users. JMI provided a

12 portion of $3.4 million of financing. Defendant

13 MOORES added to the Board of Directors.

14 **Dirig Software**: JMI invested on 3 May 2000. Developed management

15 software for e-Business. JMI Equity Fund provided part

16 of second round venture capital financing of $5 million.

17 **e.Intelligence**: JMI invested on 24 May 2000. Provided large and mid-

18 sized corporations with Web-optimized software. JMI

19 Equity provided $4.3 million in funding.

20 **Qiave Technologies Co**: JMI invested on 10 August 2000. Provided security

21 solutions for internet worked computers. JMI EQUITY

22 invested and became a Qiave partner.

23 **Astrum Software**: JMI Equity Fund invested on 5 March 2001. Provided

24 storage resource management software. JMI EQUITY

25 provided lead financing of a $5.3 million investment.

26     42.     Defendants MOORES and NOELL also caused JMI Equity Fund and its

27 related entities to provide venture capital as part of an on-going common course of

28 conduct to the following companies, which became part of the JMI EQUITY capital

portfolio of companies:

| | |
|---|---|
| **(1)  BEZ Systems, Inc.,** | BEZ Systems markets an integrated set of tolls to help user plan, manage, and control data warehouse performance effectively; |
| **(2) Burr Wolf Management, Inc.** | Burr Wolff provides state and local tax software products. |
| **(3) Changepoint Corporation** | Changepoint provided Professional Services Automation market with a web-based solution that automates the core business management processes for IT consulting firms. |
| **(4) ClearOrbit Inc.** | Clearorbit developed e-fulfillment software solutions that help companies rapidly take advantage of e-business. |
| **(5) Corliant Inc.,** | Corliant designed Intelligent Internetworking solutions.  Develops mission critical solutions. |
| **(6) CyberTech Systems Inc.** | CyberTech provides IT consulting and services. |
| **(7) Intellitactics Inc.** | Intellitactics is an innovator of security management software. |
| **(8) Managed Objects Inc.,** | Managed objects provides Business Service Management software. |
| **(9) META Security Group, Inc.** | META Security provides internet security consulting services. |
| **(10) Mindflow Technologies, Inc** | Mindflow provides strategic sourcing applications. |
| **(11) Mitchell International Inc.,** | Mitchell provider of software, publications and e-Business to the insurance and automotive collision repair industries. |
| **(12) Network Intelligence Corp.** | Network Intelligence provides network event |

21

| | | |
|---|---|---|
| 1 | | management solutions. |
| 2 | **(13)    Primax Recovering Inc.,** | Primax provides third party liability recovery, |
| 3 | | coordination of benefits and contract re-pricing |
| 4 | | services for healthcare payers. |
| 5 | **(14) Scalable Software Inc.** | Scalable develops client effectiveness |
| 6 | | management solutions. |
| 7 | **(15) Silicon Energy Corp** | Silicon Energy provides energy information |
| 8 | | management systems that allows customers to |
| 9 | | better understand their energy usage |
| 10 | **(16) Transcentive Inc.** | Transcentive provided record-keeping software |
| 11 | | and services that automate and help administer |
| 12 | | equity related compensation. |
| 13 | **(17) Unica Corporation** | Unica provided award-winning enterprise |
| 14 | | marketing management solutions for innovative |
| 15 | | companies that want to optimize customer |
| 16 | | acquisition and relationship management. |
| 17 | **(18) Xtremesoft Inc.,** | Xtremesoft developed monitoring solutions. |

43.     Defendants MOORES and NOELL before and during the time they added PEREGRINE to the JMI EQUITY venture capital portfolio were experienced venture capitalists with broad experience with financial statements.  Defendant MOORES had worked extensively with financial statements as a founder and a principal executive of BMC Software for almost 10 years.  Defendant MOORES, in connection with BMC Software going public, worked extensively with defendant NOELL on BMC Software's financial statements.  Defendant NOELL was an experienced investment banker at Alex Brown & Sons and had years of experience analyzing and preparing financial statements.

44.     Defendants MOORES and NOELL employed highly experienced personnel at defendant JMI EQUITY and its related JMI ENTITIES.  Defendant NOELL and the JMI employees had significant experience in navigating the public markets both as advisors

1   to JMI's portfolio companies and as investment bankers in the Technology Group at Alex

2   Brown.  While employed at Alex Brown, members of JMI EQUITY completed over 150

3   initial public offerings for such companies as Microsoft, BMC Software, Computer

4   Associates, Oracle, Checkfree and Sterling Commerce.  JMI's professionals had

5   extensive mergers and acquisitions expertise and provided advisory resources to JMI's

6   portfolio companies on a regular basis.

7   **PEREGRINE**

8         45.     In 1989 defendant MOORES bought a stake in PEREGRINE and by June

9   1997 he owned about 63% of PEREGRINE's stock directly.  Defendant JMI EQUITY

10   added PEREGRINE to its portfolio of companies and acquired by 1997 another 8.4%.  In

11   addition, defendant MOORES, through JMI EQUITY, had acquired ownership interests in

12   another company that was merged into PEREGRINE, XVT Software Inc., in November

13   1995.  JMI EQUITY held voting control of XVT's stock and defendant MOORES was

14   trustee for a trust that owned 131,332 shares.  From the merger between XTV and

15   PEREGRINE defendant MOORES' PEREGRINE stock was worth $3.7 million in June

16   1997.  Defendant JMI EQUITY had paid XTV approximately $3.5 million over several

17   years.  XVT's liabilities exceeded its assets by $915,000 at the time of the merger.

18   PEREGRINE sold XTV in September 1996 for $600,000 for a loss of about $600,000.

19   Defendants MOORES and NOELL have controlled PEREGRINE since 1997 by virtue of

20   defendant MOORES and JMI EQUITY'S stock ownership.

21         46.     Defendant MOORES sold over $611 million in shares of PEREGRINE

22   stock in at least 100 separate sales of PEREGRINE stock between 29 October 1997 and

23   28 February 2001.  During material periods of time MOORES sold his PEREGRINE stock

24   knowing the price he was receiving from the market was inflated due to PEREGRINE's

25   false financial statements.

26         47.     Following PEREGRINE's initial public offering in April 1997 there were a

27   total of 15,266,519 shares of Common Stock outstanding; 3,883,908 shares of Common

28   Stock were issuable upon the exercise of outstanding options.   Defendant MOORES

1   held 9,549,784 shares (73%) directly and 1,280,620 shares (9.9%) indirectly through JMI

2   Equity Fund, L.P.  Defendant NOELL held 1,325,620 shares (10.2%).  Approximately

3   3,753,816 of defendant MOORES' shares were held as trustee under various trusts

4   purportedly established for members of his family.   Defendant MOORES acquired

5   additional shares through stock splits and otherwise.

6       48.    Defendant MOORES made the following Schedule D Reports under SEC

7   Rule 13d-1(a) from February 1998 through March 2001, discarding his interests in time to

8   avoid a loss on the PEREGRINE stock.  These reports show defendant MOORES went

9   from beneficially owning 52.8% to 3.2 % of the PEREGRINE stock.

| Date MOORES sells Stock | MOORES shares | Shares owned jointly by MOORES (and Related Parties) | Aggregate MOORES ownership | MOORES ownership | Shares Sold by MOORES | Shares Sold by Related Parties |
|---|---|---|---|---|---|---|
| Feb 98 | 5,900,467 | 3,623,702 | 9,524,169 | 52.8% | 200,876 | 123,366 |
| Jul 98 | 5,375,097 | 3,301,052 | 8,676,149 | 52.8% to 45% | 525,370 | 322,648 |
| Aug 98 | 5,280,288 | 3,237,095 | 8,517,383 | 45% to 43.9% | 61,809 | 63,957 |
| Oct 98 | 4,866,820 | 3,048,231 | 7,915,051 | 43.9% to 40.8% | 309,968 | 188,864 |
| Nov 98 | 4,500,607 | 2,848,102 | 7,348,709 | 40.8% to 31.7% | 298,713 | 200,129 |

| Date MOORES sells Stock | MOORES shares | Shares owned jointly by MOORES (and Related Parties) | Aggregate MOORES ownership | MOORES ownership | Shares Sold by MOORES | Shares Sold by Related Parties |
|---|---|---|---|---|---|---|
| Feb[1] 99 | 7,928,693 | 5,303,167 | 13,231,680 | 31.7% to 28.1% | 804,521 | 393,037 |
| May 99 | 6,545,813 | 4,441,681 | 10,987,494 | 28.1% to 22.3% | 1,382,880 | 861,486 |
| Jul 99 | 5,023,094 | 3,202,831 | 8,225,925 | 22.3% to 16.6% | 1,522,719 | 970,923[2] |
| Feb[3] 2001 | 3,435,146 | 1,352,590 | 4,787,736 | 16.6% to 3.2% | | |
| Mar[4] 2001 | 3,785,146 | 1,352,590 | 5,137,736 | 3.2% to 3.4% | | |

---

[1]      There was a 2:1 stock split on 16 February 1999.  On 22 February defendant MOORES sold 804,521 PEREGRINE shares.  All sales were effected under Rule 144 through a broker at $23.00 per share.  The shared power entities sold 393,037 shares of PEREGRINE.  All sales were effected under Rule 144 through a broker at $23.00 per share.  Defendant MOORES transferred, by gifts, the following amounts: 240,000 (post-split adjusted) on 28 January 1999; 20,000 shares on 14 March 1999; and 8,000 shares on 28 April 1999.  All share amounts reported reflect PEREGRINE's stock split.

[2]      In addition, a distribution of 267,927 shares of PEREGRINE, for no consideration, was made to a beneficiary of one of the shared power JMI ENTITIES effective 1 May 1999.

[3]      There is no explanation offered explaining how defendant MOORES disposed of his stock that resulted in his total share decreasing from 16.6% to 3.2%.  The NASDAQ records show defendant MOORES disposed of substantial PEREGRINE stock in February 2000 and February 2001.

[4]      This filing was made on 7 March 2001 as an amendment to the Schedule 13G filing made on 9 February 2001.  There is no explanation in the report showing how defendant MOORES disposed of his stock to reduce his position from 16.6% to 3.4%, which purportedly put defendant MOORES below the 5% threshold requirement of Rule 13d.

25

**FRAUDULENT FINANCIAL REPORTING AND ACCOUNTING IRREGULARITIES**

49.     Defendants MOORES, NOELL, GLESS, GARDNER and ARTHUR ANDERSEN engaged in fraudulent financial reporting which included making intentional misstatements or omissions on the financial statements to deceive financial statement users within the investment community which artificially drove up the price of the PEREGRINE stock. These defendants also engaged in intentional misapplication of accounting principles relating to the amounts, classifications, manner of presentation and disclosure on the financial statements.

50.     ARTHUR ANDERSEN helped to structure several complex financial transactions with PEREGRINE and may have done so with the intent of creating false financial facts which defendant ARTHUR ANDERSEN knew were to be included on PEREGRINE's financial statements for the purpose of artificially inflating PEREGRINE's financial position and ultimately PEREGRINE's stock prices.

51.     KPMG replaced ARTHUR ANDERSEN to audit the consolidated financial statements for the year ended March 31, 2002 (fiscal 2002). On May 24, 2002 KPMG's engagement was terminated prior to the completion of the audit.  In connection with that termination, KPMG noted numerous accounting irregularities at PEREGRINE:

> "Information had come to the attention of KPMG that had led it to no longer be able to rely on representations by some members of management. This information consisted principally of customer documentation and accounting information provided by personnel within the company's sales and finance organizations which, when taken together, pointed out accounting inconsistencies, errors and irregularities, principally in the company's indirect channel sales."

52.     Among other things KPMG determined that it was necessary to significantly expand the scope of the fiscal 2002 audit because information KPMG had identified the following indicia of fraud:

///

26

1      •     Inconsistent representations regarding PEREGRINE's  consultations

2           with external corporate counsel regarding the existence of oral and

3           written "side agreements" providing for nonpayment by customers;

4      •     Representations by management that PEREGRINE had issued

5           earnings releases and filed quarterly reports with the Securities and

6           Exchange Commission without determining the extent and nature of

7           oral and written "side agreements" providing for nonpayment by

8           customers;

9      •     Misrepresentations by management of the number and extent of

10         contemporaneous sale and purchase transactions with customers;

11     •     Inconsistencies between representations received from management

12         and those received from the predecessor auditors regarding the

13         predecessor auditors' conclusions related to the accounting for a

14         contemporaneous sale and purchase transaction under investigation

15         by the Division of Enforcement of the Securities and Exchange

16         Commission;

17     •     The absence of formal minutes from any meetings of the audit

18         committee and the refusal by the Corporate Secretary to allow

19         KPMG to review manually prepared notes in the absence of formal

20         minutes from meetings of the board of directors and the audit

21         committee;

22     •     Substantial delays in providing, or an inability to provide, information

23         such as trial balances, general ledgers and subledgers that would

24         customarily be readily available from a company's accounting

25         systems or the presentation to KPMG of manually prepared

26         schedules when such information would customarily be readily

27         available from accounting systems;

28  / / /

- Inconsistent representations by management regarding the estimated effect of PEREGRINE's proposed change in accounting for sales to resellers, as well as PEREGRINE's inability to quantify the amount of sales to resellers during particular accounting periods, to determine the amount of software licenses held by resellers that had not been sold to end users, and to provide a list of resellers; and

- The nature and extent of redirection of audit inquiries to certain key management members as a result of the apparent unwillingness of finance personnel to respond directly to inquiries and information requests.

53.    ARTHUR ANDERSEN, PEREGRINE and the INDIVIDUAL DEFENDANTS also misled the public on the following categories of accounting irregularities which, when corrected, would significantly decrease the financial stability of PEREGRINE:

- Revenue recognition irregularities, principally arising in the company's indirect channel sales and, to a lesser extent, arising in connection with commercial transactions involving contemporaneous product purchase activities and investments or acquisitions. KPMG advised that correcting these irregularities would have the effect generally of delaying to later periods, or nullifying, revenue recognized from product sales.

- Accounting and transparency-of-presentation issues associated with the accounting treatment for impaired accounts receivable. KPMG advised that some write-offs of impaired accounts receivable should have been accounted for as errors in the previous recognition of revenue. KPMG also advised that where write-offs of impaired accounts receivable were appropriately made, reclassification of those adjustments as bad debt or as a reversal of revenue would be appropriate.

- The appropriateness, from an accounting perspective, of the manner in which the company recorded on its balance sheet the financing of some of

28

its accounts receivable with three banks. KPMG advised that the financing of some of these accounts receivable should be recorded for balance sheet purposes as loan transactions and not as sales of accounts receivable.

- Errors in the methodology and accounting treatment used by PEREGRINE in connection with the authorization, grant and pricing of stock options to employees. KPMG advised that correct accounting treatment would require the recordation of deferred compensation expense to the income statement, amortized over the period during which affected stock option grants vest to the employees.

54.     PEREGRINE's classification of write-offs of accounts receivable or revenue reversals recorded as "Acquisition costs and other" expense in PEREGRINE's statement of operations was not in accordance with generally accepted accounting principles. PEREGRINE's write-offs of accounts receivable or revenue reversals, depending upon the facts and circumstances, should either have been recorded as bad debts in selling, general and administrative expense in the period they became uncollectible, as reversals of revenue in the period PEREGRINE accepted a return, or as a restatement of previously recognized revenue if it was determined an error was made when the revenue was initially recognized.

55.     PEREGRINE knew that correction of these accounting irregularities would materially and substantially have a negative effect on the financial condition of PEREGRINE which would demonstrate that the previously submitted financial reports were presenting a false and misleading financial picture resulting in artificially inflated stock values.

56.     Among other things the PEREGRINE financial reports do not accurately reflect:

- The existence of concessions offered to customers on extended payment term software sales which impact PEREGRINE's ability to overcome the

29

presumption in American Institute of Certified Public Accountants Statement of Position No. 97-2 that software license revenue for such transactions is not fixed and determinable;

- The existence of numerous, significant manual adjustments to software license and maintenance revenue;

- The preparation of PEREGRINE's fiscal 2001 tax information based upon pro forma earnings rather than earnings computed in accordance with generally accepted accounting principles;

- The failure to record the deferred tax effects for accruals recorded in PEREGRINE's various business combinations accounted under the purchase method;

- The appropriateness of PEREGRINE's conclusions regarding the measurement date and impairment recognition for its discontinued operations announced in the fourth quarter of fiscal 2002;

- An understatement of the purchase price for Remedy Corporation attributable to the value of options assumed in the business combination;

- The appropriateness of PEREGRINE's lack of amortization of amounts assigned to certain intangible assets from the Remedy Corporation acquisition in accordance with Statement of Financial Accounting Standards ("SFAS") No. 142;

- The appropriate measurement date for options granted to employees where such options are generally granted with an exercise price that is the lowest price at which PEREGRINE's common stock traded between meetings of the board of directors;

- The effect on PEREGRINE's accounting for receivables as sales, under SFAS Nos. 125 and 140, of a removal-of-accounts provision in one of the PEREGRINE's accounts receivable factoring agreements and the absence of "true-sale" opinions for all of PEREGRINE's factoring agreements; and

30

1      • The appropriateness under generally accepted accounting principles of

2         PEREGRINE's possible reallocation of previously established reserves from

3         discontinued operations to continuing operations.

4   If PEREGRINE had accurately reflected its true financial position in accordance with

5   GAAP and AICPA standards, the previously issued PEREGRINE reports would be

6   adjusted to reflect a much weaker financial position which would not have supported the

7   artificially inflated stock prices.

8      57.    In and about Thursday 13 June 2002 the SEC served a subpoena upon

9   and took possession of the PEREGRINE offices in Irvine. They seized documents under

10  the authority of a subpoena. The documents sought were under the possession, custody

11  and control of Steve Spitzer, who managed PEREGRINE's alliances and partnerships

12  with KPMG, Arthur Anderson, EDS, and others. These PEREGRINE "partners" had

13  engaged in the "creative accounting" transactions identified herein. In essence they

14  agreed to accept PEREGRINE software products without having an identified customer

15  or without having a legally enforceable contract with a customer. PEREGRINE, in

16  violation of the GAAP revenue recognition rules recognized income from these

17  transactions and included them on PEREGRINE's financial statements.

18  **FALSE AND MISLEADING FINANCIAL REPORTS**

19     58.    PEREGRINE falsely reported through its financial statements to the capital

20  markets that it was continuously increasing its earnings and performance through

21  numerous financial statements and related press releases which disseminated false

22  financial facts about PEREGRINE.  As set forth herein these false financial facts

23  artificially inflated PEREGRINE's stock prices.

24     59.    Between 1997 and 2002 PEREGRINE filed at least 21 10-Q's (including

25  amendments) with the SEC, which PEREGRINE also disseminated to the public.  These

26  10-Q filings contained materially false and misleading financial statements for at least the

27  years 1999-2001.  PEREGRINE also filed 7 10-K's (including amendments) with the SEC

28  which PEREGRINE also disseminated to the public.  The 10-K's contained materially

31

1   false and misleading financial statements for at least the years 1999-2001.  PEREGRINE

2   filed with the SEC 38 registration statements (including amendments) thereto involving

3   the sale of securities to the public, in connection with business transactions and to

4   PEREGRINE employees.  Each of the registration statements or amendments filed in

5   1999 and thereafter included materially false financial statements.  Each of the filings

6   containing the false financial statements were signed or approved by  defendants

7   MOORES, NOELL, GLESS, and/or GARDNER.   The dissemination of the false

8   PEREGRINE financial statements to the public was approved by defendants ARTHUR

9   ANDERSEN, MOORES, GLESS, NOELL, and GARDNER.

10       60.    Defendants, through PEREGRINE's public communications, represented

11   that PEREGRINE had "nearly doubled" its revenue every year since going public in April

12   1997.  The annual financial statements filed with the SEC were drafted to show an ever

13   improving financial condition at PEREGRINE with the intent and affect of driving up

14   PEREGRINE's stock to artificial values:

| Year End (March) | Net Equity | Accounts Receivable | Revenue |
|---|---|---|---|
| 3/31/96 | ($8,450,000) | $6,255,000 | $23,766,000 |
| 3/97 | ($2,849,000) | $10,191,000 | 35,035, 000 |
| 3/98 | $55,639,000 | $16,761,000 | $61,877,000 |
| 3/99 | $150,781,000 | $113,158,000 | $138,063,000 |
| 3/2000 | $411,850,000 | $69,940,000 | $253,200,000 |
| 3/2001 | $1,389,765,000 | $180,372,000 | $564,683,000 |

22       61.    Due to the accounting irregularities referenced above, these financial

23   statements were false and misleading. If the financial statements were prepared in

24   accordance with GAAP and AICPA standards, PEREGRINE would not have been able to

25   file a positive financial statement. These false annual financial statements PEREGRINE

26   filed with the SEC and disseminated to the public capital markets artificially inflated the

27   market price at which PEREGRINE stock sold.  While the PEREGRINE stock was at this

28

32

1   elevated level defendants MOORES, JMI EQUITY, JMI SERVICES, GLESS, NOELL,

2   and GARDNER sold stock positions as set forth herein.

3       62.   Defendants MOORES, JMI EQUITY, JMI SERVICES, GLESS, NOELL and

4   GARDNER were successful in driving up PEREGRINE's stock prices and keeping them

5   there while they unloaded the large blocks of stock described in this operative complaint.

6   PEREGRINE prices, following the public offering in April 1997, stayed below 10 and then

7   was artificially inflated by fraudulent accounting reporting by the defendants as follows:

| Date | Price | Date | Price | Date | Price |
|------|-------|------|-------|------|-------|
| Apr-97 | $2.29 | Jan-99 | $13.32 | Oct-00 | $20.62 |
| May-97 | $2.31 | Feb-99 | $12.73 | Nov-00 | $19.39 |
| Jun-97 | $3.37 | Mar-99 | $14.10 | Dec-00 | $20.73 |
| Jul-97 | $3.76 | Apr-99 | $13.28 | Jan-01 | $23.56 |
| Aug-97 | $3.83 | May-99 | $9.95 | Feb-01 | $28.69 |
| Sep-97 | $4.63 | Jun-99 | $12.05 | Mar-01 | $20.63 |
| Oct-97 | $3.96 | Jul-99 | $13.94 | Apr-01 | $22.22 |
| Nov-97 | $3.53 | Aug-99 | $15.83 | May-01 | $27.59 |
| Dec-97 | $3.23 | Sep-99 | $19.18 | Jun-01 | $28.16 |
| Jan-98 | $3.28 | Oct-99 | $21.23 | Jul-01 | $25.98 |
| Feb-98 | $3.62 | Nov-99 | $30.17 | Aug-1 | $24.68 |
| Mar-98 | $4.39 | Dec-99 | $39.84 | Sep-01 | $18.75 |
| Apr-98 | $5.66 | Jan-00 | $40.69 | Oct-/01 | $14.58 |
| May-98 | $5.43 | Feb-00 | $45.12 | Nov-01 | $16.95 |
| Jun-98 | $6.09 | Mar-00 | $69.01 | Dec-01 | $15.30 |
| Jul-98 | $8.01 | Apr-00 | $33.61 | Jan-01 | $9.24 |
| Aug-98 | $8.40 | May-00 | $20.94 | Feb-02 | $7.38 |
| Sep-98 | $8.63 | Jun-00 | $27.89 | Mar-02 | $9.27 |
| Oct-98 | $8.95 | Jul-00 | $31.44 | Apr-02 | $8.21 |
| Nov-98 | $9.08 | Aug-00 | $26.63 | May-02 | $1.57 |
| Dec-98 | $9.89 | Sep-00 | $29.28 | Jun-02 | $1.37 |

26      63.   By reason of their management positions, membership on PEREGRINE's

27  Board of Directors, and their ability to make public statements in the name of

28

33

1  PEREGRINE, the INDIVIDUAL DEFENDANTS were and are controlling persons, and

2  had the power and influence to cause (and did cause) PEREGRINE to engage in the

3  unlawful conduct complained of herein.

4       64.    Because of their Board memberships and/or executive and managerial

5  positions with PEREGRINE, each of the INDIVIDUAL DEFENDANTS had access to the

6  adverse non-public information about the business, finances, markets and present and

7  future business prospects of PEREGRINE particularized herein via access to internal

8  corporation documents, conversations or connections with corporate officers or

9  employees, attendance at management and/or Board of Directors' meetings and

10  committee thereof and/or via reports and other information provided to them in

11  connection therewith.

12       65.    Defendants had a duty to disseminate promptly accurate and truthful

13  information with respect to PEREGRINE's operations and financial condition or to cause

14  and direct that such information to disseminated and to correct promptly any previously

15  disseminated information that was misleading to the market.  As a result of their failure to

16  do so, the price of PEREGRINE common stocks was artificially inflated during the Class

17  Period, damaging Plaintiff and the Class.

18       66.    The INDIVIDUAL DEFENDANTS, because of their positions with

19  PEREGRINE, controlled the contents of quarterly and annual reports, press releases and

20  presentations to securities analysts.  The INDIVIDUAL DEFENDANTS were each

21  provided with copies of the reports and press releases alleged herein to be misleading

22  prior to or shortly after their issuance and had the ability and opportunity to prevent their

23  issuance or cause them to be corrected.  Because of their positions and access to

24  material non-public information available to them but not the public, each of these

25  Defendants knew that the adverse facts specified herein had not been disclosed to and

26  were being concealed from the public and that the positive representations which were

27  being made were then false and misleading.  As a result, each of the INDIVIDUAL

28  DEFENDANTS is responsible for the accuracy of PEREGRINE's corporate releases

1   detailed herein as "group-published" information and is therefore liable for the

2   representations contained herein.

3        67.     Each of the Defendants is liable as a primary violator in making false and

4   misleading statements, and for participating in a fraudulent scheme and course of

5   business that operated as a fraud or deceit on purchasers of PEREGRINE stock during

6   the Class Period. All of the Defendants had motives to pursue a fraudulent scheme in

7   furtherance of their common goal, i.e., inflating the reported profits of PEREGRINE and

8   the trading price of PEREGRINE stock by making false and misleading statements and

9   concealing material adverse information. The fraudulent scheme and course of business

10   was designed to and did: (i) deceive the investing public, including Plaintiffs and other

11   Class members; (ii) artificially inflate the price of PEREGRINE stock during the Class

12   Period; (iii) cause Plaintiff and other members of the Class to purchase PEREGRINE

13   stock at inflated prices; (iv) allow INDIVIDUAL DEFENDANTS use its common stock at

14   artificially inflated prices while privy to material, adverse information regarding the

15   Company's soon to be reported financial status to acquire other companies and (v)

16   conceal the true financial condition of PEREGRINE.

17        68.     PEREGRINE expanded rapidly before and during the Class Period through

18   the acquisition of other companies. PEREGRINE purported to make these acquisitions

19   to, inter alia, expand the products and range of services it could offer to its customers.

20        69.     During the Class Period, PEREGRINE also entered into and expanded

21   relationships and alliances with managed service providers ("MSP"). These MSPs

22   purported to purchase PEREGRINE software and to resell it to end users.

23        70.     To this end, PEREGRINE boasted of its successes throughout the Class

24   Period, reporting revenue that met or exceeded analyst expectation for 17 consecutive

25   quarters, through the first quarter of fiscal 2002. Based on defendants' statements, the

26   reported revenue, and the success of its dealings with MSPs, PEREGRINE appeared to

27   be better positioned than its competitors.

28   / / /

**FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

71.     The Class Period extends back to 29 June 1999, the date of PEREGRINE's 1999 10K filing with the SEC, and forward to 6 May 2002.  PEREGRINE issued a constant flow of false and misleading information and financial statements touting PEREGRINE's constant financial growth from 1999 through 3 May 2002.  In addition to the financial statements PEREGRINE constantly bombarded the media with positive news pieces that masked the financial problems facing PEREGRINE.  The defendants flooded the press with positive news releases with the intent of accentuating the false financial statements they filed with the SEC and disseminated to the public.  The market through the public media and through other market mechanisms, including stock analysts, absorbed and believed in defendant PEREGRINE'S successfully financial performance.  The following is a representative sample of how the defendants flooded the market with positive financial and business news about PEREGRINE and how the market absorbed and believed defendant PEREGRINE's representations:

| 14 June 1999 | A press release was issued announcing PEREGRINE, IBM Global Services and KPMG Consulting would partner to provide infrastructure resource planning to their customers. |
| 14 June 1999 | PEREGRINE announced the first anniversary of its highly successful Connections Alliance Program |
| 15 June 1999 | PEREGRINE announced that it and Serena Software had reached a decision to integrate their products |
| 28 June 1999 | PEREGRINE announced it had entered into a important software pact with Kaiser Permanente |
| 29 June 1999 | PEREGRINE filed its 10-K report reporting that it had increased shareholder equity from $55,639,000 in 1998 to $150,781, 000 in 1999.  It reported revenues had increased from $35,035,000  in 1997 to $61,877,000 in 1998 to 138,063,000 in 1999 |

/ / /

| | | |
|---|---|---|
| 1 | 29 June 1999 | The Wall Street Journal "All Star Analysts 1999 Survey" noted that |
| 2 | | Melissa B. Eisestat of CIBC World Markets was the second best |
| 3 | | stock picker and her key pick was PEREGRINE.  PEREGRINE was |
| 4 | | up nearly 247% purportedly because the company was selling record |
| 5 | | amounts of its software |
| 6 | 12 July 1999 | PEREGRINE announced it had signed the largest lease in San |
| 7 | | Diego history |
| 8 | 15 July 1999 | PEREGRINE Signs With IBM Global |
| 9 | 15 July 1999 | PEREGRINE Systems Announces Availability of SPAN* FM 6.5 |
| 10 | 19 July 1999 | PEREGRINE Systems Announces Agreement with IBM Global |
| 11 | | Services |
| 12 | 21 July 1999 | PEREGRINE System Latest 1st Quarter Operating Net 14 |
| 13 | | Cents/Diluted Share |
| 14 | 21 July 1999 | PEREGRINE Systems Reports Record First Quarter Results |
| 15 | 22 July 1999 | PEREGRINE Systems and Tiscor Form Strategic Alliance |
| 16 | 22 July 1999 | Preferred Capital Markets Reiterates its STRONG BUY Rating of |
| 17 | | PEREGRINE Systems, Inc. and maintains its 12-month price target |
| 18 | | of $45. |
| 19 | 28 July 1999 | PEREGRINE Wins KPMG Endorsement |
| 20 | 30 July 1999 | PEREGRINE Takes Equity Stake in Loran Technologies OEMs |
| 21 | | Network |
| 22 | 30 July 1999 | PEREGRINE Takes Equity Stake in Network Management System |
| 23 | | Co |
| 24 | 3 August 1999 | PEREGRINE Systems Inc. Said revenue for the first quarter ended |
| 25 | | June 30 grew 137% to $21.8 m a new company record |
| 26 | 16 August 1999 | New Discovery Tool From PEREGRINE Systems Provides |
| 27 | | Comprehensive Desktop |
| 28 | /// | |

37

| | | |
|---|---|---|
| 1 | 2 September 1999 | PEREGRINE Systems Hires Senior Sales Executive to Lead North |
| 2 | | American Sales |
| 3 | 8 September 1999 | IBM Global and KPMG Team up with PEREGRINE Systems |
| 4 | 8 September 1999 | PEREGRINE Systems and Sherman Corporation Form Alliance |
| 5 | 16 September1999 | Pivotal Names Award Winners-the honored companies includes |
| 6 | | PEREGRINE |
| 7 | 20 September1999 | PEREGRINE Will Offer Linux Support Across All Product Lines |
| 8 | 22 September 1999 | BancBoston Robertson Stephens Reiterates Buy Rating on |
| 9 | | PEREGRINE |
| 10 | 23 September 1999 | PEREGRINE Systems Partners With Aust Computer Fleet |
| 11 | 28 September 1999 | PEREGRINE Systems e.fleet Brings Fleet Management to the |
| 12 | | Internet |
| 13 | 1 October 1999 | Electronic Business names Analyst All-Stars [PEREGRINE] |
| 14 | 4 October 1999 | PEREGRINE Systems Acquires Knowlix |
| 15 | 11 October 1999 | America's Richest People Techies tackle teams [PEREGRINE] |
| 16 | 12 October 1999 | PEREGRINE Systems Unveils New Initiatives to Empower E- |
| 17 | | Business |
| 18 | 18 October 1999 | PEREGRINE tools for resource planning migrate to e-com. |
| 19 | 18 October 1999 | PEREGRINE Systems Announces Workgroup Connections Alliance |
| 20 | 18 October 1999 | PEREGRINE Systems Brings Comprehensive Lifecycle IT |
| 21 | | Infrastructure |
| 22 | 18 October 1999 | PEREGRINE Systems Announces Accelerated InfraCenter for |
| 23 | | Workgroups |
| 24 | 20 October 1999 | License Revenue Growth Fuels PEREGRINE Systems; Reports |
| 25 | | Record Second |
| 26 | 25 October 1999 | Infrastructure Management Shapes Marketplace in France; |
| 27 | | PEREGRINE System |
| 28 | 26 October 1999 | PEREGRINE's Interim Earnings Soar |

| | | |
|---|---|---|
| 1 | 26 October 1999 | PEREGRINE's Systems Hires E-Business Executive; Former |
| 2 | | Gartner Group Vice |
| 3 | 27 October 1999 | PEREGRINE System's Forms Alliance With Mitsubishi Electronics |
| 4 | | America |
| 5 | 3 November 1999 | Winning Investments.com Announces Investment Opinion 3 |
| 6 | | November 1999 [PEREGRINE] |
| 7 | 5 November 1999 | This Week's Pick Issues Investment Opinion for Pacific Softworks |
| 8 | | [PEREGRINE] |
| 9 | 5 November 1999 | Equity/Alert.com Announces Investment Opinion, No. 3 of 7 |
| 10 | | [PEREGRINE] |
| 11 | 11 November 1999 | License revenue growth fuels PEREGRINE Systems |
| 12 | 16 November 1999 | San Diego Area Companies Among Deloitte & Touche Ranking of |
| 13 | | Country's 500 [PEREGRINE] |
| 14 | 30 November 1999 | PEREGRINE System's Provides United Airlines With Fleet |
| 15 | | Management |
| 16 | 7 December 1999 | Hot Stocks to Watch: PRGN [PEREGRINE] IMCL CHIC ZOMX |
| 17 | 14 December 1999 | Morningstar Analyst to Interview On Radio WallStreet Internet |
| 18 | | Broadcast [PEREGRINE] |
| 19 | 22 December 1999 | PEREGRINE Systems(R) Becomes a HOPE Giver this Holiday |
| 20 | | season |
| 21 | 11 January 2000 | PEREGRINE Systems(R) acquires KKO and Associates Software |
| 22 | | Division |
| 23 | 19 January 2000 | PEREGRINE Chooses PROKOM Software SA as Master Distributor |
| 24 | | in Poland |
| 25 | 19 January 2000 | PEREGRINE Systems(R) and Critical Path(R) Form Strategic |
| 26 | | Relationship |
| 27 | 20 January 2000 | PEREGRINE Systems Inc. Announces Stock Dividend |
| 28 | / / / | |

| | | |
|---|---|---|
| 1 | 24 January 2000 | PEREGRINE Systems, Critical Path Intro Integrated Facilities |
| 2 | | Resource |
| 3 | 24 January 2000 | PEREGRINE Systems(R) and Commerce One Join |
| 4 | 27 January 2000 | PEREGRINE Launches Infrastructure Management Solution |
| 5 | 27 January 2000 | PEREGRINE Systems Sets Up UK Channel for First Time – Partners |
| 6 | | with Ecsoft |
| 7 | 31 January 2000 | PEREGRINE Systems(R) Announces Technology Alliance With |
| 8 | | Keynote |
| 9 | 31 January 2000 | PEREGRINE Systems(R) Announces Preferred Market Connection |
| 10 | 31 January 2000 | PEREGRINE System, Keynote In Enterprise Systems Alliance |
| 11 | 1 February 2000 | PEREGRINE Buys into GoldMine |
| 12 | 2 February 2000 | Channel Strategy – PEREGRINE Swoops on Small Firms |
| 13 | 2 February 2000 | Scribe Software and PEREGRINE Systems(R) Announce Alliance |
| 14 | 2 February 2000 | CoreTech Consulting Group Teams with PEREGRINE Systems(R) |
| 15 | 2 February 2000 | EnterpriseWorks Signs 30th PEREGRINE Systems Implementation |
| 16 | | Contract |
| 17 | 2 February 2000 | Trinity's Real-Time Root Cause and Impact Analysis Adds Value To |
| 18 | | PEREGRINE |
| 19 | 3 February 2000 | SERENA Software and PEREGRINE Systems Announce Web- |
| 20 | | Based Seminar Series |
| 21 | 3 February 2000 | PEREGRINE Systems(R) to Use Cognose(R) E-Business Solutions |
| 22 | 3 February 2000 | PEREGRINE Systems(R) and ACS Sign Agreement |
| 23 | 3 February 2000 | PEREGRINE Systems(R) Brings Infrastructure Management |
| 24 | | Solution to the Palm |
| 25 | 3 February 2000 | PEREGRINE Systems(R) Introduces InfraTools(TM) Network |
| 26 | | Discovery |
| 27 | 3 February 2000 | PEREGRINE Systems(R) Get.Resources(TM) is Purchased by ICL |
| 28 | 3 February 2000 | PEREGRINE in Pacts with Affiliated Computer, Cognos |

| | | |
|---|---|---|
| 1 | 7 February 2000 | Stac Software and PEREGRINE Systems Team Up to Integrate |
| 2 | | Products |
| 3 | 8 February 2000 | Ecsoft to Offer PEREGRINE Systems' Software as Hosted Service |
| 4 | 8 February 2000 | PEREGRINE's Consolidated Service Desk now Available via ASP |
| 5 | 10 February 2000 | PEREGRINE Buys Telco Research of Toronto for $162M |
| 6 | 25 February 2000 | PEREGRINE Systems(R) Makes Equity Investment in |
| 7 | | SupplyAccess(TM) |
| 8 | 29 February 2000 | Primus eMarketing Software Helps make PEREGRINE Systems |
| 9 | | Shine Online |
| 10 | 1 March 2000 | PEREGRINE SYSTEMS (acquires computer software division of |
| 11 | | KKO and Associates) |
| 12 | 1 March 2000 | GoldMine Introduces HEAT InfraSolution Powered by PEREGRINE |
| 13 | | Systems |
| 14 | 2 March 2000 | Market Savvy "Palm" Is the Word as PEREGRINE Stock Rockets on |
| 15 | | Software News |
| 16 | 6 March 2000 | PEREGRINE Systems(R) Announces the Integration of Wireless |
| 17 | | Technology |
| 18 | 13 March 2000 | PEREGRINE to Integrate Wireless Technology with |
| 19 | | FLEETANYWHERE |
| 20 | 13 March 2000 | PEREGRINE Systems Launches ServiceCenter Interface |
| 21 | 13 March 2000 | PEREGRINE Unveils Get.Answers! Product |
| 22 | 26 March 2000 | PEREGRINE to Take Flight into Lucrative Disputes Zone |
| 23 | 3 April 2000 | PEREGRINE Systems(R) Completes Acquisitions of Telco Research |
| 24 | | and Barnhill |
| 25 | 6 April 2000 | PEREGRINE Spreading Its Wings with Move to Acquire Harbinger |
| 26 | 10 April 2000 | EDS and PEREGRINE Systems enhance client service directory |
| 27 | 10 April 2000 | PEREGRINE Systems Announces AssetCenter(TM) 3.5 |
| 28 | 10 April 2000 | PEREGRINE System Introduces AssetCenter 3.5 Software |

| | | |
|---|---|---|
| 12 April 2000 | PEREGRINE Systems (R) Selected by QUALCOMM as Standard for New Business | |
| 13 April 2000 | Force 3, Inc. Partners With PEREGRINE Systems to Offer Network... | |
| 17 April 2000 | PEREGRINE Systems (R) and ICL Take Leadership Position in European... | |
| 20 April 2000 | PEREGRINE Systems (R) Partners With Motive Communications to Offer... | |
| 24 April 2000 | PEREGRINE Systems Conference Call to be Broadcast by Investor Broadcast | |
| 27 April 2000 | PEREGRINE Systems CEO to Interview On RadioWallStreet.com | |
| 28 April 2000 | PEREGRINE Systems' Get.Answers! Tool Extends IT Helpdesk | |
| 28 May 2000 | PEREGRINE, Idec are on top-five list | |
| 30 May 2000 | Rapid Link Selects PEREGRINE Systems to Provide Operations Support | |
| 30 May 2000 | PEREGRINE Systems (R) and KPMG Consulting, LLC Announce Alliance | |
| 1 June 2000 | PEREGRINE's motive is self-support | |
| 14 June 2000 | PEREGRINE flies Anywhere | |
| 26 June 2000 | PEREGRINE Systems (R) and Corporate Software & Technology Form Worldwide Alliance | |
| 27 June 2000 | PEREGRINE Systems, Boise Cascade Office Form Alliance | |
| 27 June 2000 | PEREGRINE Systems (R) Partners With Boise Cascade Office Products To Create Alliance | |
| 29 June 2000 | Holder Registers PEREGRINE SYSTEMS INC. Stock | |
| 30 June 2000 | Vulcan Ventures Reports 1.5% Stake in PEREGRINE Systems | |
| 30 June 2000 | Vulcan Ventures/PEREGRINE Stake-2: Holds 2.1 Million Cmn Shares | |

/ / /

42

| | | |
|---|---|---|
| 1 | 10 July 2000 | PEREGRINE Systems(R) Announces Enhanced Network |
| 2 | | Management Support |
| 3 | 11 July 2000 | PEREGRINE Systems(R) Introduces Get2Connect.net, Single Entry |
| 4 | | Point |
| 5 | 11 July 2000 | PEREGRINE Systems Unveils Get2Connect.net Web Site |
| 6 | 12 July 2000 | PEREGRINE Systems(R) Announces the Availability of |
| 7 | | IntraTools(TM) Desktop ... |
| 8 | 17 July 2000 | AmeriQuest Forms Alliance with PEREGRINE Systems(R) to Offer |
| 9 | | Infrastructure |
| 10 | 18 July 2000 | Whereoware.com Forms Strategic Partnership with PEREGRINE |
| 11 | | Systems |
| 12 | 19 July 2000 | ON24 Audio Investor Alert: Analyst: PEREGRINE Systems to Report |
| 13 | 19 July 2000 | ServiceWare and PEREGRINE Systems Partner to Link IT Answer |
| 14 | | Delivery With ... |
| 15 | 19 July 2000 | PEREGRINE Systems Names Steve GARDNER Chairman CEO |
| 16 | 19 July 2000 | PEREGRINE Systems(R) Reports Record First Quarter Revenues Of |
| 17 | | $94.3 million |
| 18 | 19 July 2000 | Peregrine Systems Q1 EPS 10 cents from 7 on strong software |
| 19 | | license sales |
| 20 | 23 July 2000 | PEREGRINE, Softco join forces |
| 21 | 27 July 2000 | PEREGRINE Systems(R) Announces Strategic Alliance and Equity |
| 22 | | Investment |
| 23 | 28 July 2000 | PEREGRINE Systems Seeks to Boost Auth Common Shares to 500 |
| 24 | | Million |
| 25 | 31 July 2000 | PEREGRINE, New Era of Networks in Systems Devt Pact |
| 26 | 31 July 2000 | PEREGRINE Systems(R) and NEON Form Alliance to Develop |
| 27 | | Packaged Integration |
| 28 | / / / | |

43

| | | |
|---|---|---|
| 1 | 15 August 2000 | PEREGRINE Systems(R) Receives CIO-100 Award for Customer |
| 2 | | Service Excellence |
| 3 | 16 August 2000 | PEREGRINE Systems(R) Sees Continuing Success With |
| 4 | | InfraTools(TM) Network |
| 5 | 17 August 2000 | PEREGRINE to pay $92 million for Loran acquisition |
| 6 | 22 August 2000 | PEREGRINE System Expands Pact With Hyperion Associates |
| 7 | 3 October 2000 | PEREGRINE Systems(R) Announces Next Generation Solution for |
| 8 | | e-Market |
| 9 | 4 October 2000 | PEREGRINE: To Meet Or Exceed Street 2nd Quarter Views |
| 10 | 24 October 2000 | PEREGRINE Systems Reports 2nd Quarter Earnings PRGN |
| 11 | 1 November 2000 | PEREGRINE Systems(R) ASP Business Gains Momentum In the |
| 12 | | First Half |
| 13 | 11 December 2000 | PEREGRINE Systems(R) Forges Strategic Global Relationships |
| 14 | | With Major IBM |
| 15 | 24 January 2001 | PEREGRINE Sys 3Q Op Net 15c/Shres Vs 8c |
| 16 | 25 January 2001 | PEREGRINE Systems' third-quarter showing bucks tech trend |
| 17 | 27 February 2001 | PEREGRINE Systems Names Bill Richardson Director |
| 18 | 5 March 2001 | PEREGRINE Systems(R) TeleCenter Named Best Telemanagement |
| 19 | | Package |
| 20 | 12 March 2001 | PEREGRINE Sys To Buy Extricity Inc. for 9.2M Shrs |
| 21 | 13 March 2001 | PEREGRINE Systems acquires Extricity for $168 million |
| 22 | 23 March 2001 | PEREGRINE Systems Launches New Brand Under the Banner of |
| 23 | | Frictionless |
| 24 | 26 March 2001 | PEREGRINE Systems(R) Kicks Off Global Advertising Campaign |
| 25 | 27 March 2001 | PEREGRINE Systems (R) Launches New Version of Flagship |
| 26 | | Product |
| 27 | 28 March 2001 | PEREGRINE Systems(R) Teams With Largest IBM/Tivoli Partner in |
| 28 | | Malaysia |

| 1 | 1 April 2001 | PEREGRINE gets strong buy rating |
| 2 | 19 April 2001 | PEREGRINE Systems(R) to Announce Final Fiscal Fourth Quarter |
| 3 | | Results |
| 4 | 24 April 2001 | PEREGRINE Systems(R) Completes Acquisition of Extricity |
| 5 | 25 April 2001 | Anxebusiness and PEREGRINE Systems Form Strategic Alliance |
| 6 | 26 April 2001 | PEREGRINE Systems(R) Confirms Fiscal Fourth Quarter and Year- |
| 7 | | End Results |
| 8 | 8 May 2001 | PEREGRINE Systems(R) Lifecycle Procurement Combines e- |
| 9 | | Procurement and Asset |
| 10 | 14 May 2001 | PEREGRINE Perches Atop the Pack |
| 11 | 14 May 2001 | PEREGRINE Systems(R) Wins Network Computing's 2001 Well- |
| 12 | | Connected Award |
| 13 | 16 May 2001 | PEREGRINE Systems(R) Wins 2001 Midrange Technology |
| 14 | | SHOWCASE |
| 15 | 17 May 2001 | Ebusiness Bulletin - PEREGRINE claims a good year |
| 16 | 12 June 2001 | PEREGRINE to Acquire Remedy in a $1.09 Billion Transaction |
| 17 | 12 June 2001 | PEREGRINE Systems Says Acquisition of Remedy Will Boost Profit |
| 18 | | by 8% |
| 19 | 13 June 2001 | PEREGRINE Systems ranked fourth among B2B e-procurement |
| 20 | | leaders by AMR |
| 21 | 13 July 2001 | PEREGRINE Sys, Compaq in Asset Mgmt Services Pact |
| 22 | 13 July 2001 | PEREGRINE Systems(R) and Predictive Systems(TM) Create IT |
| 23 | | Asset Assessment |
| 24 | 25 July 2001 | Audio Investor Alert: PEREGRINE CEO: We're in the Right Place At |
| 25 | | the Right Time |
| 26 | 26 July 2001 | CFA Converts Wrap; PEREGRINE Sys Meets 1Q Challenge |
| 27 | 26 July 2001 | Profit news pushes up PEREGRINE stock 20% |
| 28 | /// | |

| | | |
|---|---|---|
| 1 | 2 August 2001 | TECHNOLOGY BRIEFING SOFTWARE: I.B.M. PACT LIFTS |
| 2 | | PEREGRINE SHARES |
| 3 | 30 August 2001 | PEREGRINE shares rise 11$ on earnings news: "In a conference |
| 4 | | call after markets closed Tuesday, PEREGRINE said it expects |
| 5 | | revenue to hit $1 billion this year because of its acquisition of Silicon |
| 6 | | Valley rival Remedy Corp. |
| 7 | 26 October 2001 | PEREGRINE 'very happy' with 10% rise in earnings |
| 8 | 9 December 2001 | The strong, silent type / With little fanfare, PEREGRINE is |
| 9 | | weathering tech sector turmoil: "At a time when so many competitors |
| 10 | | are suffering, the San Diego company is still a Wall Street darling. |
| 11 | | Nearly every analyst following the company has rated it a 'strong |
| 12 | | buy' or 'buy.'" |

13   72.   On 19 July 2000 PEREGRINE issued a press release, this time announcing

14  "record" revenues for the first quarter.  PEREGRINE announced revenues had increased

15  83% to 94.3 million, and net income on a pro rata basis of $12.1 million. Defendants'

16  financial results were repeated in the company's misleading quarterly report on Form 10-

17  Q, filed on August 14, 2000: The report falsely states:

18   These financial statements, in our opinion, include all

19   adjustments (consisting only of normal recurring accruals)

20   necessary for a fair presentation of the financial position,

21   results of operations, and cash flows for all periods presented.

22   73.   On October 24, 2000, defendants issued a press release announcing

23  "record" second quarter results.  PEREGRINE falsely announced revenues had

24  increased 147% to $142.7 million, with net income on a pro forma basis of $18.3 million.

25  Commenting on these results, defendant GARDNER stated, "[w]e had a remarkable

26  quarter of growth . . . a most successful quarter . . ." Defendants' financial results were

27  repeated in a misleading quarterly report on Form 10-Q filed on November 14, 2000:.

28  The report falsely states:

1       These financial statements, in our opinion, include all

2       adjustments (consisting only of normal recurring accruals)

3       necessary for a fair presentation of the financial position,

4       results of operations, and cash flows for all periods presented.

5     74.    On January 24, 2001, Defendants issued a press release announcing

6 "record" third quarter results.  PEREGRINE falsely announced revenues had increased

7 132% to $156.6 million, with net income on a pro forma basis of $22.6 million.

8 Commenting on these results, defendant GARDNER stated, ". . . we exceeded our

9 objectives for the December quarter" . . . "This was a very important quarter to

10 PEREGRINE." Defendants' financial results were repeated in a misleading quarterly

11 report on Form 10-Q filed on February 14, 2001:.  The report falsely states:

12       These financial statements, in our opinion, include all

13       adjustments (consisting only of normal recurring accruals)

14       necessary for a fair presentation of the financial position,

15       results of operations, and cash flows for all periods presented.

16     75.    On April 26, 2001, Defendants issued a press release announcing "record"

17 fourth quarter and annual results.  PEREGRINE announced revenues for the fourth

18 quarter increased 124% to $171 million, and revenues for the year increased 123% to

19 $564.7 million.  On a pro forma basis, PEREGRINE falsely announced fourth quarter net

20 income of $24.8 million, and annual net income of $77.8 million.  Commenting on these

21 results, defendant GARDNER stated, "[i]n the past year, PEREGRINE has clearly

22 established itself as the leading global provider of integrated infrastructure management

23 and e-market solutions . . . Our results this quarter in the face of challenging economic

24 conditions demonstrates the value of our solution. . . .  We are particularly pleased with

25 the strength of our sales through managed service providers [MSP] and our professional

26 services partners."  The Company's financial results were repeated in a misleading

27 annual report on Form 10-K, filed on June 29, 2001.   It also set forth PEREGRINE's

28 revenue recognition policy for software licenses:

1              Revenues from direct and indirect license agreements are

2              recognized, provided that all of the following conditions are

3              met: a noncancellable license agreement has been signed;

4              the product has been delivered; there are no material

5              uncertainties regarding customer acceptance; collection of

6              resulting receivable is deemed probable; risk of concession is

7              deemed remote; and no other significant vendor obligations

8              exist.

9      76.    On July 24, 2001, Defendants issued a press release announcing "record"

10  first quarter results.  PEREGRINE falsely announced revenues had increased 82% to

11  $172 million, with net income on a pro forma basis of $12.1 million.  Commenting on

12  these results, defendant GARDNER stated: "[w]e were pleased to post significant top-line

13  growth in this challenging economic environment . . . Our customers are seeking ways to

14  improve their productivity and achieve a rapid return on their investments.  Our results

15  this quarter reflect our ability to deliver on these objectives." Defendants financial results

16  were repeated in a misleading quarterly report on Form 10-Q filed on August 13, 2001.

17  The report falsely states:

18              These financial statements, in our opinion, include all

19             adjustments (consisting only of normal recurring accruals)

20             necessary for a fair presentation of the financial position,

21             results of operations, and cash flows for all periods presented.

22      77.    On October 24, 2001, Defendants issued a press release announcing

23  "record" second quarter results.  PEREGRINE falsely announced revenues of $175

24  million, with net income on a pro forma basis of $8.4 million. Commenting on these

25  results, defendant GARDNER stated, "PEREGRINE is well positioned to succeed in this

26  environment.  Our products offer significant return on investment, and the breadth and

27  modularity of our offerings allow us to tailor our solutions to meet specific customer

28  requirements and rollout schedules." Defendants' financial results were repeated in a

1  misleading quarterly report on Form 10-Q filed on November 13, 2001.  The report falsely

2  states:

3          These financial statements, in our opinion, include all

4          adjustments (consisting only of normal recurring accruals)

5          necessary for a fair presentation of the financial position,

6          results of operations, and cash flows for all periods presented.

7          78.     During a conference call with analysts on or about October 24, 2001,

8  defendants GARDNER and other PEREGRINE agents gave guidance that

9  PEREGRINE's revenues would be $220 to $230 million in the third quarter, and that

10  there was progress on sales to MSPs.

11          79.     In a press released dated January 2, 2002, PEREGRINE announced

12  preliminary third quarter results.  PEREGRINE announced revenues of $175 million, with

13  a net loss, on a pro forma basis, of $.07 to $.08 per share.

14          80.     Commenting on these results, defendant GARDNER stated "[t]here were

15  really three primary areas of contribution to the shortfall in revenue: Europe, our

16  managed-services providers customer segment, and the direct sales of our business

17  relationship management products . . . Europe was by far the biggest issues of the

18  December quarter, accounting for over almost 75 percent of the shortfall."  GARDNER

19  attributed much of the problem to the loss of the European sales manager during the

20  third quarter.

21          81.     On April 8, 2002, the Company filed a Form 8-K with the SEC announcing

22  that on April 2, 2002, ARTHUR ANDERSEN LLP was terminated and KPMG LLP was

23  appointed as principal accountants for PEREGRINE.  The decision to change

24  accountants was approved by the audit committee and the full Board of Directors of the

25  Company.  At the same time, PEREGRINE announced that it would announce its fourth

26  quarter and year-end results after the close of business on May 2, 2002.

27          82.     On April 24, 2002, PEREGRINE announced it had entered into a strategy

28  alliance agreement with IBM to jointly deliver infrastructure resource management.  On

1 | April 24, 2002, PEREGRINE stock closed at $8.31.

2 | 83. During the class Period, the above statements were false and misleading

3 | due to the accounting inaccuracies set forth above and for the following reasons:

4 | (a) during fiscal 2001 and 2002, the Company improperly recognized

5 | approximately $100,000,000 in revenue from sales through indirect

6 | channels, when, in fact, those revenues were not properly recognizable

7 | under GAAP;

8 | (b) during fiscal 2001 and 2002, the Company improperly wrote-off revenue

9 | that should never have been recognized, instead of restating its previously

10 | reported earnings; and

11 | (c) PEREGRINE's financial reports failed to disclose that revenues were

12 | overstated in fiscal 2001 and 2002.

13 | 84. On April 25, 2002, PEREGRINE announced that it was delaying its planned

14 | earnings release and conference call related to the results for the fourth quarter and fiscal

15 | year 2002, as KPMG needed time to complete the audit. PEREGRINE did not announce

16 | that there was any problems or irregularities being investigated.

17 | 85. On May 1, 2002, an analyst that follows PEREGRINE was interviewed by

18 | ON24 Financial Network. The analyst said that the company did not deny fraud as the

19 | reason for the delay. The analyst also stated that MSP's currently have approximately

20 | $100,000,000 in unused PEREGRINE software licenses.

21 | 86. Before the market opened on May 6, 2002, the full scope of defendants'

22 | fraud was revealed. PEREGRINE stunned the market by announcing an internal

23 | investigation into accounting irregularities. PEREGRINE's press release states, "[t]he

24 | scope and magnitude of these matters have not been determined. Based on the

25 | preliminary information review to date, certain transactions involving revenue recognition

26 | irregularities, totaling as much as $100 million, have been called into question and may

27 | have been recorded during the periods in fiscal 2001 and 2002. These transactions were

28 | recorded initially as revenue from the company's indirect channels and may have been

1    written off in later quarters."  PEREGRINE also announced the resignation of defendant
2    GARDNER.

3        87.    In response to these disclosures revealing, at least in part, the Company's
4    true financial condition, PEREGRINE's shares fell sharply.  PEREGRINE's stock closed
5    at $8.31 on April 24, 2002.  On May 6, 2002, the price of PEREGRINE stock dropped
6    from $2.57 to $.89, a drop of 65%.

7        88.    During the class period defendants MOORES, GLESS, GARDNER and
8    NOELL knowingly or recklessly signed the three PEREGRINE 10K annual reports that
9    contained false financial statements.  Defendant GARDNER signed in his capacity as
10   PEREGRINE's President and Chief Executive Officer (1999, 2000) or as PEREGRINE's
11   Chief Executive Officer and Chairman of the Board (2001).  Defendant MOORES singed
12   the three 10-K's as PEREGRINE's Chairman of the Board and director (1999, 2000) or
13   as a director (2001). Defendant NOELL signed all three 10-K reports (1999, 2000, 2001)
14   in his capacity as a director.

15       89.    Each of PEREGRINE'S 10-K reports signed by defendants GARDNER,
16   NOELL, and MOORES contained the following statement above their  signature line:

17       Pursuant to the requirements of the Securities Exchange Act fo 1934, this
18       Report on Form 10-K has been signed on behalf of the Registrant by the
19       following persons and in the capacities and the dates indicated:

20   Defendant GLESS signed on behalf of PEREGRINE and his co-defendants ten 10-Q
21   reports filed for the periods between 31 March 1998 to 31 December 2001.  Each 10-Q
22   defendant GLESS signed contained a financial report together with the following
23   statement:

24       Pursuant to the requirements of the Securities & Exchange Act of 1934, the
25       registrant has duly caused this report on form 10-Q to be signed on its
26       behalf by the undersigned thereunto duly authorized in the City of San
27       Diego, California this _____ day of _____.

28   / / /

90.   Each and every 10-K and 10-Q report beginning with the 29 June 1999 10-K was false and misleading because the financial statements materially overstated assets, revenue, and understated liability and expenses. These false financial statement filings were made in the following filings:

| # | DATE | REPORT | SIGNED BY |
|---|------|--------|-----------|
| 1 | 29 June 1999 | 10-K Annual Report Year ended 31 March 1999 | GARDNER, GLESS, MOORES, and NOELL III |
| 2 | 13 Aug 1999 | 3 Months ended 30 June 1999 | GLESS |
| 3 | 15 Nov 1999 | 3 Months ended 30 September 1999 | GLESS |
| 4 | 11 Feb 2000 | 3 Months ended 31 December 1999 | GLESS |
| 6 | 10 May 2000 | 10-K Annual Report for year ended March 31, 2000. | GARDNER, GLESS, MOORES, and NOELL III |
| 7 | 14 Aug 2000 | 3 Months ended 30 June 2000 | GLESS |
| 8 | 14 Nov 2000 | 3 Months ended 31 September 2000 | GLESS |
| 9 | 14 Feb 2001 | 3 Months ended 31 December 2000 | GLESS |
| 10 | 29 June 2001 | 10K Annual Report 2001 (Year end 31 March 2001) | GARDNER, GLESS, MOORES, and NOELL III |
| 11 | 14 Aug 2001 | 3 months ended 30 June 2001 | GLESS |
| 12 | 13 Nov 2001 | 3 months ended 30 Sept 2001 | GLESS |
| 13 | 14 Feb 2002 | 3 months ended 31 December 2001 | GLESS |
| 14 | 4 March 2002 | Amendment to 10-Q for 31 December 2001 | GLESS |

91.   On 29 June 1999 PEREGRINE filed and disseminated to the public its 1999 annual report (Year End 31 March) on Form 10-K that contained PEREGRINE's false financial statements. Defendants GARDNER, MOORES, NOELL, GLESS, and

1   PEREGRINE falsely represented that PEREGRINE's net shareholder equity had

2   increased from $55 million to $150.7 million.  These defendants falsely represented that

3   PEREGRINE's earnings increased from $61 million to $138 million.  As a direct and

4   proximate result of these favorable financial results being reported to the capital markets,

5   PEREGRINE's average stock price for June 1999 and July 1999 rose to $25.69 and

6   $29.88 respectively.

7        92.    On 26 July 1999 defendant MOORES sold 2,493,642 PEREGRINE shares

8   at 28.50 per share for a total sales price of $71 million.  On 13 August 1999 PEREGRINE

9   filed and disseminated to the public its 10-Q for the quarter ended 30 June 1999.

10  Defendants GARDNER, MOORES, NOELL, GLESS and PEREGRINE falsely

11  represented that PEREGRINE's net stock holder equity had risen from $150.7 million as

12  of 31 March 1999 to $172.2 million as of 30 June 1999.  These defendants also

13  misrepresented in this 10-Q that revenues had increased from $21.7 million for the three

14  months ended June 1998 to $51.6 million for the three months ended 1999.

15       93.    As a direct and proximate result of these favorable but false financial results

16  defendants reported to the capital markets by defendants, PEREGRINE stock rose to

17  $33 in August and to $40.75 in September 1999.

18       94.    On 15 November 1999 PEREGRINE filed and disseminated to the public its

19  10-Q for the quarter ended 31 September 1999.  Defendants ARTHUR ANDERSEN,

20  GARDNER, MOORES, NOELL, GLESS, and PEREGRINE falsely represented that

21  PEREGRINE's net stock holder equity had risen $150.7 million, as of 31 March 1999 to

22  $193.8 million, as of 30 September 1999.  These defendants also misrepresented in this

23  10-Q that revenues had increased from $29.6 million for the three months ended 30

24  September 1998 to $57.8 million for the three months ended 30 September 1999.  They

25  further misrepresented that revenues had risen from $51.4 million for the six months

26  ended 30 September 1998 to $109.4 million for the six months ended 30 September

27  1999.

28  ///

95.     As a direct and proximate result of these favorable but false financial results defendants reported to the capital markets by defendants, PEREGRINE stock rose to $70 in November and $84.19 in December 1999.

96.     On 11 February 2000 PEREGRINE filed and disseminated to the public its 10-Q for the quarter ended 31 December 1999. Defendants ARTHUR ANDERSEN, GARDNER, MOORES, NOELL, GLESS and PEREGRINE falsely represented that PEREGRINE's net stockholder equity had risen from $150.7 million as of 31 March 1999 to $ 281.4 million as of 31 December 1999. These defendants also misrepresented in this 10-Q that revenues had increased from $40.5 million for the three months ended 31 December 1998 to $67.5 million for the three months ended 31 December 1999. They further misrepresented that revenues had risen from $91.5 million for the nine months ended 31 December 1998 to $176.9 million for the nine months ended 31 December 1999.

97.     As a direct and proximate result of the false financial statements defendants filed with the SEC and disseminated to the public reporting PEREGRINE's 31 December 1999 quarterly financial results PEREGRINE's stock held steady at $56 in February 2000 and rose to $67.06 in March 2000.

98.     One week after the defendants filed and disseminated PEREGRINE's false financial statements, defendant MOORES began a massive sell off of his stock. Defendant MOORES, in 8 separate transactions in February 2000 sold 4,559,167 PEREGRINE shares for a total sales price of $229 million. Defendants MOORES sold on 17 February (251,436 @$46.06 per share), 17 February (1,143,016 @$46.06 per share), 18 February (466,960 @$43.68 per share), 18 February (2,122,736 @$43.68 per share), 28 February (89,799 @ $51.35), 28 February (466,220 @ $51.35), 29 February (89,799@ $51.35 per share), and 29 February (408,220 @ $52.65 per share). Defendant MOORES waited a year until 2001 to unload the next portion of his PEREGRINE portfolio also in February.

/ / /

99.   On 10 May 2000 defendant PEREGRINE filed and disseminated to the public its 2000 annual report (Year End 31 March) on form 10-K that contained PEREGRINE's false financial statements.  Defendants GARDNER, MOORES, NOELL, GLESS, and PEREGRINE falsely represented that PEREGRINE's net shareholder equity had increased from the prior year's $150.7 to $411.8.  These defendants falsely represented that PEREGRINE's earnings increased from the prior year's $138 million to $253.3 million.

100.   On 14 August 2000 PEREGRINE filed and disseminated to the public its 10-Q for the quarter ended 30 June 2000.  Defendants ARTHUR ANDERSEN, GARDNER, MOORES, NOELL, GLESS and PEREGRINE falsely represented that PEREGRINE's net stockholder equity had risen from $411.8 million as of 31 March 2000 to $1.763 billion as of 30 June 2000.  These defendants also misrepresented in this 10-Q that revenues had increased from $51.6 million for the three months ended 30 June1999 to $94.3 million for the three months ended 30 June 2000.

101.   As a direct and proximate result of these favorable but false financial results filed and disseminated to the capital markets by defendants, PEREGRINE's stock rose in August to $31.94.  PEREGRINE stock prices declined in September 2000 to $18.94 and came back to $24.00 in October 2000.

102.   On 14 November 2000 PEREGRINE filed and disseminated to the public its 10-Q for the quarter ended 30 September 2000.  Defendants GARDNER, MOORES, NOELL, GLESS and PEREGRINE falsely represented that PEREGRINE's net stockholder equity had risen from $ 411.8 million as of 31 March 2000 to $1.763 billion as of 30 September 2000.  These defendants also misrepresented that PEREGRINE's revenues had increased from $57.8 million for the three months ended September 1999 to $142.7 million for the three months ended 30 September 2000.  They also misrepresented that revenues had increased from $109.4 million for the 6 months ended 30 September 1999 to $237 million for the 6 months ended 30 September 2000.

///

1    103.   As a direct and proximate result of these favorable but false financial

2  statements, PEREGRINE's stock came back in January 2001 to $30.63.

3    104.   On 14 February 2001 PEREGRINE filed its 10-Q for the quarter ended 31

4  December 2000.  Defendants ARTHUR ANDERSEN, GARDNER, MOORES, NOELL,

5  GLESS and PEREGRINE falsely represented that PEREGRINE's net stockholder equity

6  had risen from $411.8 million as of 31 March 2000 to $1.794 billion as of 31 December

7  2000. These defendants also misrepresented that PEREGRINE's revenues increased

8  from $63.2 million as of three months ended 31 December 1999 to $156.6 million for the

9  three months ended 31 December 2000. They also misrepresented that PEREGRINE's

10  revenues had increased from $176.9 million for the nine months ended 31 December

11  1999 to $393.6 million for the year ended 31 December 2000.

12    105.   As a direct and proximate result of these favorable but false financial

13  statements, PEREGRINE's stock traded at prices substantially higher than would have

14  been the case had accurate financial statements been used.  In February 2001

15  PEREGRINE's stock was at $24.63 and in March it dipped down to $19.50.  In April

16  PEREGRINE was back up to $25.78 and $27.69 in May 2001 and $29 in June 2001.

17    106.   Defendant MOORES used the opportunity to unload another substantial

18  portion of his PEREGRINE portfolio in February 2001 in 11 transactions beginning on 8

19  February 2001 and continuing on 12 February, 13 February, 15 February, 16 February,

20  20 February, 23 February, 26 February, 27 February, and 28 February.  Defendant

21  MOORES sold  3,456,223 shares of PEREGRINE stock and received in return

22  $101,430,942.   Defendant MOORES made these sales knowing the prices were

23  supported artificially by PEREGRINE's false financial statements.

24    107.   On 29 June 2001 PEREGRINE filed its 2001 annual report on Form 10-K

25  (Year ended 31 March).  Defendants ARTHUR ANDERSEN, GARDNER, MOORES,

26  NOELL, GLESS and PEREGRINE falsely represented that PEREGRINE's net

27  stockholder equity had risen from $411.8 billion for year end 31 March 2000 to $1.3

28  billion  for year end 31 March 2001.  These defendants also misrepresented that

56

1  PEREGRINE's revenues had increased from $253 million year ended 31 March 2000 to

2  $564 million year ended 31 March 2001.

3      108.   On 14 August 2001 PEREGRINE filed its 10-Q for the quarter ended 30

4  June 2001. Defendants ARTHUR ANDERSEN, GARDNER, MOORES, NOELL, GLESS

5  and PEREGRINE falsely represented that PEREGRINE's net stock equity had declined

6  slightly from $1.38 billion as of 31 March 2001 to $1.34 billion for the quarter ended 30

7  June 2001. These defendants also misrepresented that PEREGRINE's revenues had

8  increased from $94.3 million for the three months ended 30 June 2000 to $172 million for

9  the three months ended 30 June 2001.

10     109.   As a direct and proximate result of these favorable but false financial

11  statements PEREGRINE stock fell materially less than would have been the case

12  following the tragic events on 11 September 2001. In September 2001 PEREGRINE

13  stock fell to $12.63 but it climbed back to $14.44 in October and $15.55 in November

14  2001.

15     110.   On 13 November 2001 PEREGRINE filed its 10-Q for the quarter ended 30

16  September 2001. Defendants ARTHUR ANDERSEN, GARDNER, MOORES, NOELL,

17  GLESS and PEREGRINE falsely represented that PEREGRINE's net stockholder equity

18  had increased from $1.38 billion as of 31 March 2001 to $1.68 billion as of 30 September

19  2001. These defendants also misrepresented that PEREGRINE's revenues had

20  increased from $142.7 million for the three months ended 30 September 2000 to $175

21  million for the three months ended 30 September 2001. They also misrepresented that

22  PEREGRINE's revenues had increased from $237 million for the six months ended 30

23  September 2000 to $347 million for the six months ended 30 September 2001.

24     111.   As a direct and proximate result of these favorable but false financial

25  statements, PEREGRINE's stock continued to trade above its true market value. In

26  December it traded at $14.83. In January PEREGRINE still was several dollars above its

27  full disclosure price, the stock traded for about $7.99 in January 2002 and $9.00 in

28  February 2002.

112.   On 14 February 2002 PEREGRINE filed its 10-Q for the quarter ended 30 September 2001.  Defendants ARTHUR ANDERSEN, GARDNER, MOORES, NOELL, GLESS and PEREGRINE falsely represented that PEREGRINE's net stockholder equity had increased from $1.38 billion as of 31 March 2001 to $1.59 billion as of 31 December 2001.  These defendants also misrepresented that PEREGRINE's revenues had increased from $156 million for the three months ended 31 December 2000 to $175 million for the three months ended 31 December 2001.  They also misrepresented that PEREGRINE's revenues had increased from $393 million for the nine months ended 31 December 2000 to $522 million for the nine months ended 2001.

113.   As a direct and proximate result of these favorable but false financial statements, PEREGRINE's stock continued to trade at prices materially above it true full disclosure market value.  In March PEREGRINE's stock climbed to $9.52.  In April it declined to $6.85 and in May, after it was announced that PEREGRINE's past financial statements were in doubt the stock fell to $1.38.  Following more dire disclosures that PEREGRINE's accounting firm had found evidence of fraud the stock fell even further in June.

114.   The market for PEREGRINE securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, PEREGRINE securities traded at artificially inflated prices during the Class Period.  The artificial inflation continued until the time PEREGRINE admitted that its revenues were overstated and its dealings with MSPs not nearly as strong as touted, and these admissions were communicated to the securities markets.  Plaintiff and other members of the Class purchased or otherwise acquired PEREGRINE securities relying on Defendants' statements concerning PEREGRINE's record performance and financial growth and upon the integrity of the market price of PEREGRINE securities and market information relating to PEREGRINE and have been damaged thereby.

///

115.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PEREGRINE securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

116.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about PEREGRINE's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of PEREGRINE and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## DEFENDANTS' VIOLATIONS OF GAAP

117.   In Securities Act Release No. 6349 (September 8, 1981), the SEC has stated that:

> It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

118.   In addition, as noted by the SEC in Accounting Series Release 173:

> It is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

59

1    119.   In this regard, the SEC has promulgated Regulation S-X, 17 C.F.R. 210.4-

2    01(a)(1), which provides that financial statements filed with the SEC that fail to conform to

3    the requirements of GAAP, such as PEREGRINE's financial statements for the periods

4    ending July 30, 2000, September 30, 2000, December 31, 2000, fiscal year ending

5    March 31, 2001, July 30, 2001, September 30, 2001, and December 31, 2001, are

6    presumptively misleading and inaccurate.

7    120.   The accounting principle that revenue is to be accounted for at the time that

8    the earnings process is complete is a well established under GAAP and it has been

9    reaffirmed by the SEC on numerous occasions:

10          a.      Accounting And Auditing Enforcement Release No. 817

11          (September 19, 1996) which states: "Under APB Statement

12          No. 4, which was rescinded in March 1993, revenue was

13          generally recognized when (1) the earnings process was

14          complete or virtually complete, and (2) an exchange had taken

15          place.  This revenue recognition concept has been carried

16          forward in FASB Statement of Financial Accounting Concepts

17          No. 5, para. 83-84, and in other authoritative literature and

18          continues to provide the foundation for revenue recognition in

19          accordance with GAAP."

20          b.      Accounting and Auditing Enforcement Release No. 812

21          (September 5, 1996) which states: "Generally Accepted

22          Accounting Principles ("GAAP") provide that revenue should

23          not be recognized until an exchange has occurred, the

24          earnings process is complete, and the collection of the sales

25          price is reasonably assured.  These conditions ordinarily are

26          met when products are exchanged for cash or claims to cash,

27          and when the entity has substantially performed the

28          obligations which entitle it to the benefits represented by the

1       revenue."

2   PEREGRINE's financial statements and reports identifies herein, failed to comply with

3   these GAAP standards and are thus presumptively false.

4   **THE PEREGRINE "BARNEY" ALLIANCES**

5       121.   PEREGRINE formed alliances and partnerships with a number of other

6   software and related businesses.  Under these arrangements a "buddy system" was

7   created in which the participants agreed to accommodate one another in structuring

8   transactions with the intent of generating revenues so each company could show inflated

9   or artificial revenues on their respective books.  PEREGRINE and its "partners" used a

10  variety of "creative accounting" techniques to generate income including "software

11  swaps" also known as a "Barney" deal.  This term referred to Barney the purple dinosaur

12  who tells his friends: "I love you, you love me."

13      122.   Amongst PEREGRINE's "partners" who participated in either channel

14  stuffing or software swaps or other creative accounting transactions were IBM Global

15  Services; Arthur Andersen; Siebel; Critical Path; KPMG; Deloitte Touche; People

16  Systems Apropos; ICL; Fujitsu; and EDS.

17      123.   Creative accounting transactions with these PEREGRINE "partners" formed

18  a substantial portion of the $100 million KPMG auditors identified, in their aborted audit,

19  as income PEREGRINE improperly recognized under GAAP.

20  **PEREGRINE'S INFLATED SECOND QUARTER REVENUES**

21      124.   On 19 January 2000 PEREGRINE and Critical Path (NASDAQ:CPTH)

22  issued a news release that provided that PEREGRINE and Critical Path, a provider of

23  business-to-business Internet messaging and collaboration solutions, had "formed a

24  strategic relationship" to deliver an integrated Internet solution to manage their customers

25  facilities.

26      125.   On 19 July 2000 PEREGRINE reported a steep loss for its fiscal first

27  quarter ended 30 June 2000. Although revenue was reported 83% higher than in the

28  year-earlier quarter PEREGRINE reported its net loss came to $95.1 million, or 83 cents

61

1   a basic share, compared with a loss of $4.8 million, or five cents a share, in the year-

2   earlier period. Although PEREGRINE'S first quarter results were in line with estimates,

3   defendants GARDNER, MOORES, NOELL III, and GLESS were under pressure to

4   produce a profit in PEREGRINE's next quarter.

5       126.    Before, during and after the "strategic relationship" between PEREGRINE

6   and Critical Path was announced, defendant GARDNER, and others at PEREGRINE,

7   and Critical Path President David A. Thatcher (Thatcher) had developed a working

8   relationship. Thatcher is 47 and resides in Rancho Santa Fe, California, as does

9   defendant MOORES.  Thatcher received a B.S. in accounting from San Diego State

10  University and was a CPA in California. Thatcher served as manager of the audit and

11  accounting systems department with the accounting firm of Price Waterhouse in 1985 in

12  San Diego. Thatcher also served as a senior manager of the comprehensive professional

13  services department of Price Waterhouse in San Diego beginning in 1988.  Altogether

14  Thatcher spent 11 years in public accounting, leaving as a senior manager in the

15  Emerging Businesses Group of Price Waterhouse in San Diego. Thatcher has had a long

16  term relationship with defendant MOORES.  Thatcher served as Peregrine's CFO from

17  March 1993 to November 1995, during which time PEREGRINE was under the control of

18  defendant MOORES. In 1994 Thatcher publicly supported MOORES' bid for the Major

19  League Baseball team, the San Diego Padres: "Given his financial background and his

20  desire to do things right, he would be good for the Padres."

21      127.    In response to the pressures at both companies to produce profits in their

22  next quarters, PEREGRINE and Critical Path engaged in a series of transactions as part

23  of a fraudulent scheme to falsely inflate each of their respective earnings in

24  PEREGRINE's quarter two and Critical Path's quarter three. The response of Critical Path

25  and PEREGRINE to these pressures to produce profits led to the criminal conviction of

26  Thatcher for securities fraud, and to SEC enforcement actions against both Thatcher and

27  Critical Path.

28  ///

128.   On 2 February 2002 the SEC filed a civil action charging Thatcher with participating in a scheme to inflate Critical Path's revenues and earnings for fiscal 2000, in part based on its business dealings with PEREGRINE. The SEC complaint against Thatcher alleged that during 2000 Thatcher and other Critical Path employees caused Critical Path to record revenue from fictitious, contingent, or backdated transactions in its third quarter of fiscal 2000, one of which involved the "software swap" transaction between PEREGRINE and Critical Path.

129.   A permanent injunction was issued by the United States District Court for the Northern District of California against Thatcher from violating Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 (Exchange Act) and Exchange Act Rules 10b-5 and 13b2-1, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Exchange Act Rule 13a-13. Included as a basis for these charges against Thatcher was the "software swap" transaction between PEREGRINE and Critical Path.

130.   Thatcher was also required to pay a $110,000 civil penalty for his participation in the financial fraud and was barred for five years from acting as an officer or director of a public company. Thatcher also was prohibited from the privilege of appearing or practicing before the SEC as an accountant. In addition, Thatcher agreed in his plea bargain to cooperate in an on-going investigation by the SEC and U.S. Department of Justice.

131.   Thatcher pled guilty to criminal securities fraud charges, based in part on the "software swap" transaction between PEREGRINE and Critical Path. Thatcher pled guilty before United States District Judge William H. Alsup in federal court in San Francisco. Thatcher admitted his participation in a conspiracy to commit securities fraud in violation of Title 18, U.S.C., Section 371.

132.   At least one PEREGRINE officer, defendant GARDNER, participated directly in that conspiracy in connection with the "software swap" between PEREGRINE and Critical Path.

133.   Thatcher admitted he had conspired to engage in the fraudulent "software swap" with PEREGRINE in which Critical Path improperly recognized revenue during the third quarter 2000 (PEREGRINE's second quarter).

134.   Thatcher admitted he participated in negotiations with defendant GARDNER for a nonmonetary exchange of software, the "software swap" between PEREGRINE and Critical Path. Under the terms of the "software swap" with PEREGRINE, Critical Path provided PEREGRINE with software and cash in return for PEREGRINE software. Critical Path then accounted for the transaction as though it were a cash sale, without disclosing to investors that it had merely exchanged software with PEREGRINE. The effect of this "software swap" was to artificially inflate Critical Path's revenues for the third quarter and to artificially inflate PEREGRINE's revenues for its second quarter (PEREGRINE's fiscal year ends on March 31).  Thatcher also admitted that he realized that Critical Path's recognition of revenue for the software swap was improper.

135.   PEREGRINE engaged in the fraudulent "software swap" transaction that formed a part of the basis for Thatcher's guilty plea to civil and criminal securities fraud in order to meet PEREGRINE's second quarter projections. As part of the illegal transaction, on 28 September 2000 PEREGRINE agreed to buy out an existing periodic royalty obligation to Critical Path for $2.85 million and to buy another $240,500 of software. In exchange, Thatcher signed an agreement obligating Critical Path to buy about $4 million of software and services from PEREGRINE, $2.6 million more than Critical Path was set to purchase just days before. PEREGRINE improperly reported the Critical Path obligation as revenue for its second quarter.

136.   To recognize revenue from this barter transaction-an exchange of goods and services in which the two sides were contingent on one another-in conformity with Generally Accepted Accounting Principles (GAAP), PEREGRINE had to (a) value the exchange at the fair value of either the software it received from, or the software it sent to, the business software company, and (b) ascribe a value to the software it was

1    receiving that reasonably reflected its expected use of the software. PEREGRINE and
2    Critical Path failed to properly comply with these GAAP principles.

3         137.   Defendants GARDNER, MOORES, NOELL, and GLESS knew, or were
4    reckless in not knowing, that the dollar amounts assigned to the two transactions were
5    not based on fair value, and that the dollar amounts had increased not because Critical
6    Path needed much of the $4 million of software and services it was purchasing from
7    PEREGRINE but because PEREGRINE needed more revenue in the second quarter.
8    PEREGRINE knew or was reckless in not knowing that Critical Path was engaging in the
9    transaction, for the same reason, to artificially increase Critical Path's earnings so it could
10   be misrepresented to the investment market.

11        138.   To make the two transactions look like they were not contingent on one
12   another, defendant GARDNER and Thatcher, along with others at PEREGRINE and
13   Critical Path arranged for the parties to prepare two separate contracts, exchange checks
14   for the full amounts owed, and make their payments to each other on different days.

15        139.   Defendant PEREGRINE recorded the sale to Critical Path as revenue for
16   the second quarter. Defendants PEREGRINE, MOORES, NOELL, GLESS, and
17   GARDNER knew, or were reckless in not knowing, that this PEREGRINE-Critical Path
18   software swap should not have been recorded as revenue, but did cause PEREGRINE,
19   along with others, to record, this transaction as revenue.

20        140.   On 4 October 2000 PEREGRINE announced that it would meet or exceed
21   consensus earnings per share estimates of $.11 per share and total revenue of $142
22   million. On 24 October 2000 PEREGRINE announced "record results" for the second
23   quarter ended 30 September 2000. A PEREGRINE news release claimed that total
24   revenues for the second quarter increased 147% to a record $142.7 million, compared
25   with revenues of $57.8 million in the comparable prior year period. Net income was
26   reported to be $18.3 million or $.0.12 per diluted share for the second quarter compared
27   to $8.4 million or $0.08 per diluted share for the comparable prior year period.
28   ///

141.   Defendants PEREGRINE, MOORES, GLESS, and GARDNER caused the false PEREGRINE financial statement report on form 10-Q to be filed with the SEC. The financial statements, in addition to reflecting revenues derived from the fraudulent "software swap" transaction between PEREGRINE and Critical Path also reflected other improper income derived from "channel stuffing" in which revenue was realized for software that was shipped to customers who did not intend to pay for the software and for which there was no bona fide orders.

142.   The channel stuffing relationship developed in the following context:

| Date | Event |
| --- | --- |
| 19 January 2000 | Peregrine and Critical Path Form Strategic Relationship to Deliver Integrated Internet Facilities Recourse Management Solution |
| 19 July 2000 | Peregrine issues press release stating it had Record First Quarter Revenue of $94.3 million and net income of $0.10 per share. |
| 19 July 2000 | Dow Jones Business News reports Peregrine had "steep loss" for its fiscal first quarter of "$95.1 million, or 83 cents a basic share." |
| 19 July 2000 | Peregrine appoints Steve Gardner Chairman and CEO. Moores resigns as Chairman |
| 28 July 2000 | Peregrine Seeks to increase its authorized shares of Common Stock from 200 million to 500 million |
| 1 September 2000 | Peregrine reports that it has merged with Harbinger Corp in a "transaction worth about $2.1 billion." |
| 8 September 2000 | Peregrine files to sell 2.7 million Common shares for holders |

| Date | Event |
|------|-------|
| 28 September 2000 | SEC charges "a counter party" to Critical Path [Peregrine] agreed to buy out an existing periodic royalty obligation from Critical Path for $2.85 million and to buy another $240,500 of software. In exchange, Critical Path agreed to buy about $4 million of software and services, $2.6 million more than Critical was set to purchase just days before. The SEC charges that to make the two transactions look like they were not contingent on one another, Critical Path President David Thatcher, [Peregrine's CFO from March 1993 to November 1995] |
| 4 October 2000 | Peregrine issues news release representing it expects to meet or exceed consensus earnings per share estimates of $.11 per share and total revenue of $142 million. |
| 24 October 2000 | Peregrine issues news release announcing "record results for the second quarter ended September 30, 2000. Peregrine represents that results were driven by a 136% increase in software license revenues over the comparable period prior year period. Peregrine represented total revenues increased 147% to a record $142.7 million or $.12 cents per share. Included in this report is the fraudulent transaction with Critical Path |

143.    Another transaction from which Critical Path reported false income involved ICL, a division of Fujitsu Ltd. A Criminal Information, to which Thatcher pled guilty, charged that Thatcher caused Critical Path in essence to pay $2.7 million which ICL was to use to buy software from Critical Path. Critical Path then recognized revenue for ICL's payment. To avoid the appearance that the arrangement involved related transactions, the agreements were prepared as separate documents, which did not refer to each other. Peregrine also engaged in bogus transactions with ICL in order to generate false income.

144.    In June 1999 PEREGRINE announced ICL had purchased PEREGRINE's software claiming it would provide leading-edge technology that would enhance ICL's managed service capability with the addition of true infrastructure management. The announcement provided that ICL had completed a multi-million pound deal with

1  PEREGRINE for PEREGRINE's ServiceCenter and AssetCenter Infrastructure

2  Management products across its Operational Services business.

3      145.   In March 2000 PEREGRINE announced that ICL had purchased Get

4  Resources from PEREGRINE claiming ICL was intending to deploy the software to its

5

6  major corporate accounts worldwide. ICL claimed it had also selected PEREGRINE to be

7  a strategic partner.

8      146.   In April 2000 PEREGRINE and ICL announced that PEREGRINE and its

9  "strategic partner" ICL had deployed PEREGRINE's Get Resources software in eight of

10  ICL's top tier managed service accounts. In fact, ICL was a reseller of PEREGRINE

11

12  software and PEREGRINE prematurely recognized material amounts of income from its

13  transactions with ICL for software that was shipped but not sold and which did not satisfy

14  the revenue recognition requirements of GAAP.

15  **STATUTORY SAFE HARBOR**

16      147.   The federal statutory safe harbor provided for forward-looking statements

17  under certain circumstances does not apply to any of the allegedly false statements

18  pleaded in this Complaint. Further, none of the statements pleaded herein which were

19  forward-looking statements were identified as "forward-looking statements" when made.

20

21  Nor was it stated that actual results "could differ materially from those projected." Nor

22  were the forward-looking statements pleaded herein accompanied by meaningful

23  cautionary statements identifying important factors that could cause actual results to

24  differ materially from the statements made therein. Defendants are liable for the forward-

25  looking statements pleaded herein because, at the time each of those forward-looking

26

27  statements was made, the speaker knew the forward-looking statement was false and

28  the forward-looking statement was authorized and/or approved by an executive officer of

1   PEREGRINE who knew that those statements were false when made.

2       148.   The Defendants, individually and in concert, engaged in a plan, scheme,

3   and course of conduct, pursuant to which they knowingly and/or recklessly engaged in

4
5   acts, transactions, practices, and courses of business which operated as a fraud upon

6   Plaintiffs and made various untrue and deceptive statements of material fact and omitted

7   to state material facts necessary in order to make the statements made, in light of the

8   circumstances under which they were made, not misleading to Plaintiffs as set forth

9   above. The purpose and effect of this scheme was to induce Plaintiffs to purchase

10  PEREGRINE common stock at artificially inflated prices.  Defendants, pursuant to their

11
12  plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or

13  caused to be issued statements to the investing public as described above.

14      149.   Defendants knew and/or recklessly disregarded the falsity of the foregoing

15  statements. As senior officers and/or directors of the Company, the INDIVIDUAL

16  DEFENDANTS had access to the non-public information detailed above.

17      150.   At all relevant times, the market for PEREGRINE's publicly traded securities

18  was an efficient market for the following reasons, among others: (a) PEREGRINE's

19  securities were listed and actively traded on the NASDAQ Market which is an efficient

20  market; (b) As a regulated issuer, PEREGRINE filed periodic public reports with the SEC;

21  (c) PEREGRINE regularly communicated with public investors via established market

22  communication mechanisms, including through regular disseminations of press releases,

23  analyst conferences and conference calls; and (d) PEREGRINE was followed by several

24
25  securities analysts who wrote reports which were published, distributed and entered the

26  public marketplace.

27  ///
28

69

151.   As a result of the foregoing, the market for PEREGRINE's publicly traded securities promptly digested current information regarding PEREGRINE from all publicly available sources and reflected such information in the price of PEREGRINE's securities. Under these circumstances, all purchasers of PEREGRINE's publicly traded securities during the Class Period suffered similar injury through their purchase of PEREGRINE's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

152.   PEREGRINE acted through the INDIVIDUAL DEFENDANTS, whom it portrayed and represented to the press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the INDIVIDUAL DEFENDANTS are therefore imputed to PEREGRINE, which is primarily responsible for the securities law violations of the INDIVIDUAL DEFENDANTS while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the INDIVIDUAL DEFENDANTS under the doctrine of respondeat superior.

153.   Each of the defendants knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in PEREGRINE common stock. Had the adverse facts defendants concealed been properly disclosed, PEREGRINE's shares would not have sold at the artificially inflated prices they did.

154.   As a result of the foregoing, the market price of PEREGRINE common stock was artificially inflated. In ignorance of the false and misleading nature of the representations, Plaintiffs relied, to their detriment, on the integrity of the market as to the price of PEREGRINE common stock.

/ / /

70

155.   Had Plaintiffs and the marketplace known of the true operating and financial results of PEREGRINE, which, due to the actions of Defendants were not disclosed, Plaintiffs would not have purchased or otherwise acquired their PEREGRINE common stock or, if they had acquired PEREGRINE common stock, they would not have done so at the artificially inflated prices at which they purchased their stock. Hence, Plaintiffs were damaged by said Defendants' violations of Section 10(b) and Rule 10b-5.

156.   Plaintiffs were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions and other fraudulent conduct alleged herein. The decline in the price of PEREGRINE's common sock was caused by the public dissemination on or about October 16, 2001 of the true facts, which were previously concealed or hidden. Absent said Defendants' wrongful conduct, Plaintiffs would not have been injured.

157.   The price of PEREGRINE common stock declined materially upon public disclosure of the true facts which had been misrepresented or concealed, as alleged in this complaint. Plaintiffs have suffered substantial damages as a result of the wrongs alleged herein.

158.   The accounting firm of ARTHUR ANDERSEN was hired by PEREGRINE with the approval of its directors to provide the accounting data necessary for compliance with state and federal securities statutes. As a result ARTHUR ANDERSEN owed a duty of full and complete disclosure to shareholders in PEREGRINE, as well as regulatory authorities. ARTHUR ANDERSEN breached that duty by failing to fully and adequately disclosed PEREGRINE's debt positions by overstating PEREGRINE's net income for each year beginning in 1999 and by failing to fully and adequately disclose PEREGRINE's accounting irregularities as detailed above.  All of these actions or

71

1   inactions violated generally accepted principles of accounting, (GAAP).   The

2   PEREGRINE transactions were not adequately reflected in the filings done or overseen

3   by ARTHUR ANDERSEN and were not reported by ARTHUR ANDERSEN in accordance

4

5   with standard accounting practices or as required by state and federal securities acts.

6   The cover-up by ARTHUR ANDERSEN of these transactions constituted gross

7   negligence entitling these Plaintiffs to recovery of punitive damages.   These failures on

8   the part of ARTHUR ANDERSEN each constituted negligence and were a proximate

9   cause of the precipitous drop in the value of Plaintiffs' shares in PEREGRINE. All of the

10  above transactions constituted a violation of both federal and state security laws and

11

12  GAAP. Each of the Plaintiffs herein suffered monetary losses because of their reliance on

13  the accounting reports and audits for which they seek actual and punitive damages.

14  **FRAUD-ON-THE-MARKET**

15      159.   At all relevant times, the market for PEREGRINE securities was an efficient

16  market for the following reasons, among others:

17          a.      PEREGRINE met the requirements for listing, and was listed

18                  and actively traded, on the NASDAQ, a highly efficient market;

19

20          b.      As a regulated issuer, PEREGRINE filed periodic public

21                  reports with the SEC and the NASD;

22          c.      PEREGRINE stock was followed by securities analysts

23                  employed by major brokerage firms who wrote reports which

24                  were distributed to the sales force and certain customers of

25                  their respective brokerage firms.  Each of the these reports

26                  was publicly available and entered the public marketplace;

27

28                  and

d.   PEREGRINE regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

160.   As a result, the market for PEREGRINE securities promptly digested current information with respect to PEREGRINE from all publicly-available sources and reflected such information in PEREGRINE's stock price.  Under these circumstances, all purchasers of PEREGRINE securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### For Violations of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

161.   Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

162.   During the Class Period, PEREGRINE and defendants MOORES, NOELL, GLESS, JMI EQUITY, JMI SERVICES, GARDNER, and ARTHUR ANDERSEN, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PEREGRINE common stock; and (iii) cause Plaintiff and other members of the Class to purchase PEREGRINE stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, PEREGRINE and the INDIVIDUAL DEFENDANTS, and each of them, took the actions set forth herein.

73

163.   These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PEREGRINE securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The INDIVIDUAL DEFENDANTS are also sued herein as controlling persons of PEREGRINE, as alleged below.

164.   In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate promptly truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01 et seq.) and S-K (17 C.F.R. §229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

165.   PEREGRINE and the defendants ARTHUR ANDERSEN, JMI EQUITY, JMI SERVICES, GLESS, MOORES, NOELL, and GARDNER, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices,

74

performance, operations and future prospects of PEREGRINE as specified herein.

These Defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of

PEREGRINE's value and performance and substantial growth, which included the

making of, or the participation in the making of, untrue statements of material facts and

omitting to state material facts necessary in order to make the statement made about

PEREGRINE and its business, operations and future prospects in the light of the

circumstances under which they were made, not misleading, as set forth more particularly

herein, and engaged in transactions, practices and a course of business which operated

as a fraud and deceit upon the purchasers of PEREGRINE securities during the Class

Period.

166.    Each of the INDIVIDUAL DEFENDANTS' primary liability, and controlling

person liability, arises from the following facts: (i) each of the INDIVIDUAL

DEFENDANTS was a high-level executive and/or director at the Company during the

Class Period; (ii) each of the INDIVIDUAL DEFENDANTS, by virtue of his responsibilities

and activities as a senior executive officer and/or director of the Company, was privy to

and participated in the creation, development and reporting of the Company's internal

budgets, plans, projections and/or reports; (iii) the INDIVIDUAL DEFENDANTS enjoyed

significant personal contact and familiarity with each other and were advised of and had

access to other members of the Company's management team, internal reports, and

other data and information about the Company's financial condition and performance at

all relevant times; and (iv) the INDIVIDUAL DEFENDANTS were aware of the Company's

dissemination of information to the investing public which they knew or recklessly

1  disregarded was materially false and misleading.

2      167.   The INDIVIDUAL DEFENDANTS engaged in such a scheme to inflate the

3  price of PEREGRINE Securities in order to: (i) protect and enhance their executive

4  positions and the substantial compensation and prestige they obtained thereby; (ii)

5  
6  enhance the value of their personal holdings through the sale of PEREGRINE common

7  stock; and (iii) enable the Company to complete the acquisitions discussed above using

8  PEREGRINE securities as currency.

9      168.   These Defendants had actual knowledge of the misrepresentations and

10  omissions of material facts set forth herein, or acted with reckless disregard for the truth

11  in that they failed to ascertain and to disclose such facts, even though such facts were

12  
13  readily available to them.  Such Defendants' material misrepresentations and/or

14  omissions were done knowingly or recklessly and for the purpose and effect of

15  concealing PEREGRINE's operating condition, business practices and future business

16  prospects from the investing public and supporting the artificially inflated price of its stock.

17  As demonstrated by their overstatements and misstatements of the Company's financial

18  condition and performance throughout the Class Period, the INDIVIDUAL

19  DEFENDANTS, if they did not have actual knowledge of the misrepresentations and

20  
21  omissions alleged, were reckless in failing to obtain such knowledge by deliberately

22  refraining from taking those steps necessary to discover whether those statements were

23  false or misleading.

24      169.   As a result of the dissemination of the materially false and misleading

25  information and failure to disclose material facts, as set forth above, the market price of

26  PEREGRINE's securities was artificially inflated during the Class Period.  In ignorance of

27  
28  the fact that the market price of PEREGRINE's shares was artificially inflated, and relying

directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PEREGRINE securities during the Class Period at artificially inflated high prices and were damaged thereby.

170.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the market place known of the true performance, business practices, future prospects and intrinsic value of PEREGRINE, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PEREGRINE securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid. Additionally, plaintiffs would have sought other compensation for the options provided and would not have lost out on the options benefits received.

171.   By virtue of the foregoing, PEREGRINE and the INDIVIDUAL DEFENDANTS each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

172.   The accounting firm of ARTHUR ANDERSEN was hired by PEREGRINE with the approval of its directors to provide the accounting data necessary for compliance with state and federal securities statutes. As a result ARTHUR ANDERSEN owed a duty of full and complete disclosure to shareholders in PEREGRINE, as well as regulatory authorities. ARTHUR ANDERSEN breached that duty by failing to fully and adequately

1  disclosed PEREGRINE true financial condition through the use of accounting

2  irregularities and false and misleading statements. All of these actions or inactions

3  violated GAAP and AICPA Standards as set forth above. These failures on the part of

4
5  ARTHUR ANDERSEN were a proximate cause of the precipitous drop in the value of

6  Plaintiffs' shares in Peregrine. All of the above transactions and the failure of ARTHUR

7  ANDERSEN to properly record and document them constituted a violation of both federal

8  and state security laws and GAAP.

9         173.   Each of the Plaintiffs herein suffered monetary losses because of their

10  reliance on the accounting reports and audits of ARTHUR ANDERSEN.  As a direct and

11  proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the
12
13  Class suffered damages in connection with their purchases of the Company's securities

14  and in the loss of their options during the Class Period.

15                          **SECOND CLAIM FOR RELIEF**

16                     **For Violations of Section 20(a) Of The**
17                **Exchange Act Against Defendants MOORES, GLESS,**
                  **NOELL, GARDNER, JMI EQUITY and JMI SERVICES**
18
19         174.   Plaintiff repeats and realleges the allegations set forth above as it set forth

20  fully herein.  This claim is asserted against the INDIVIDUAL DEFENDANTS.

21         175.   Defendants MOORES, GLESS, NOELL, JMI EQUITY, JMI SERVICES, and

22  GARDNER were and acted as control persons of PEREGRINE within the meaning of

23  Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

24
25  positions with the Company, participation in and/or awareness of the Company's

26  operations and/or intimate knowledge of the Company's actual performance, the

27  INDIVIDUAL DEFENDANTS had the power to influence and control and did influence

28  and control, directly or indirectly, the decision-making of the Company, including the

content and dissemination of various statements which Plaintiff contends are false and misleading.

176.   Each of the INDIVIDUAL DEFENDANTS was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

177.   In addition, each of the MOORES, GLESS, NOELL, JMI EQUITY, JMI SERVICES and GARDNER had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

178.   As set forth above, PEREGRINE and the INDIVIDUAL DEFENDANTS each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Defendants MOORES, GLESS, NOELL and GARDNER are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities and the loss of their options during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

1.   For an order declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the

1        Class defined herein;

2        2.      For damages awarding Plaintiff and the other members of the Class

3    damages in an amount which may be proven at trial, together with interest thereon;

4        3.      For pre-judgment and post-judgment interest, as well as their reasonable

5    attorneys' and experts' witness fees and other costs; and

6

7        4.      For all other relief the Court deems proper.

8                            **JURY DEMAND**

9        Plaintiff demands a trial by jury.

10

11                              AGUIRRE & MEYER
                                A Professional Corporation
12

13   Dated:  June 24, 2002

14                              Michael J. Aguirre

15

16                              Michael J. Aguirre, Esq.
                                AGUIRRE & MEYER
17                              A Professional Corporation
                                550 West C Street,
18                              Suite 1350
                                San Diego, California 92101
19                              619-235-8636

20
                                Raymond P. Boucher, Esq.
21                              Kiesel Boucher & Larson LLP
                                8648 Wilshire Blvd
22                              Beverly Hills, CA 90211
                                (310)854-4444
23

24                              Robert P. Ottilie, Esq.
                                Law Offices of Robert Ottilie
25                              550 West C Street,
                                Suite 1600
26                              San Diego, California 92101
                                619- 231-4841
27

28

                                      80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Thomas V. Urmy, Jr., Esq.
SHAPIRO HABER & URMY LLP
75 State Street
Boston, MA 02109
(617) 439-3939

JS44
(Rev. 07/89)

**CIVIL COVER SHEET**

F I L E D

02 JUN 24 PM 2: 53

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

I (a) PLAINTIFFS
MICHELE VOTH, VICTORIA JIBAJA
MILLER, and MARIJO A. CLEMONS,
individually and on behalf of
all present and former ** in

DEFENDANTS
PEREGRINE SYSTEMS INC.; JOHN J. MOORES;
STEPHEN P. GARDNER; CHARLES E. NOELL III;
MATTHEW C. GLESS; JMI EQUITY FUND L.P.; JMI
SERVICES INC.; & ARTHUR ANDERSEN

(b) COUNTY OF RESIDENCE OF FIRST LISTED   San Diego
PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND
INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Michael J. Aguirre, Esq.
AGUIRRE & MEYER
550 West C Street, Suite 1350
San Diego, CA 92101   619-235-8636

ATTORNEYS (IF KNOWN)

'02 CV 01238 BTM (NLS)

II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in
Item III

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)                  FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE
JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Section 10, 1934 Securities Exchange Act.   Securities Fraud.
15. 78 - rc

V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Label & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | ☐ 650 Airline Regs | SOCIAL SECURITY | ☐ 810 Selective Service |
| | | | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 862 Black Lung (923) | |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | LABOR | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | FEDERAL TAX SUITS | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | Security Act | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

VII. REQUESTED IN
COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION
UNDER f.r.c.p. 23

DEMAND $ _____

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

VIII. RELATED CASE(S) IF ANY (See Instructions):   JUDGE   LORENZ   Docket Number 02-CV-1168-L (POR)

DATE   June 24, 2002

SIGNATURE OF ATTORNEY OF RECORD   Rochelle J. Salita

**EMPLOYEES OF PEREGRINE SYSTEMS INC, who participated in the Employee Stock
Purchase Plan similarly situated

::ODMA\PCDOCS\WORDPERFECT\22838\1 January 24, 2000 (3:10pm)

PD #50.00   6/24/02 #83786 VB